# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-00599-SCT

## CONSOLIDATED WITH

## NO. 2004-IA-01833-SCT

*SHARON W. DUNN*

*v.*

*DR. JOHN G. YAGER, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/13/2009 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | GREGG LINDSEY SPYRIDON |
| | PHILIP GIPSON SMITH |
| ATTORNEYS FOR APPELLEE: | BRETT K. WILLIAMS |
| | KEVIN M. MELCHI |
| | RICHARD WILLIAM FRANKLIN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 04/14/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Sharon W. Dunn claimed severe back and leg pain caused by a work-related forklift accident.  After obtaining no relief following sixteen months of treatment from other physicians, Dunn was referred to John G. Yager, M.D., a board-certified neurologist practicing in Mobile, Alabama, with the Neurology Center ("Center").  On May 10, 1995, Dr. Yager prescribed Tegretol to Dunn, which she began taking on May 19, 1995.  On June

13, 1995, Dunn experienced an adverse reaction, which rapidly worsened over the next two days. Subsequently, she was diagnosed as having Stevens-Johnson Syndrome ("SJS"). As a result of the SJS, Dunn is now blind, along with other physical problems.

¶2. In April 1996, Dunn filed suit in the Circuit Court of Jackson County, Mississippi, against multiple defendants, including Dr. Yager. Following the dismissal of all other defendants by virtue of settlement, bankruptcy, or summary judgment, Dr. Yager is the lone remaining defendant. Dunn alleged that Dr. Yager had failed to procure her informed consent by failing to warn of alleged material risks associated with Tegretol, including SJS, and that he had breached the standard of care applicable to a neurologist prescribing Tegretol for neuropathic pain by failing to warn Dunn that flu-like symptoms may indicate an adverse reaction to the medication.

¶3. In 2006, this Court determined that Dr. Yager's interlocutory appeal from the denial of his "Motion to Dismiss for Lack of Personal Jurisdiction" had been "improvidently granted." In January 2009, following a twenty-day trial, the jury found in favor of Dr. Yager. Following the circuit court's denial of Dunn's "Motion for Judgment Notwithstanding the Verdict, Relief from Judgment and New Trial," Dunn filed her direct appeal, to which Dr. Yager filed a cross-appeal regarding the issue of personal-jurisdiction.

## FACTS

¶4. On September 15, 1993, Dunn was involved in a forklift accident at her workplace, Ingalls Shipyard ("Ingalls")[1] in Pascagoula, Mississippi, resulting in back and leg pain. On

---

[1]Now, Northrop Grumman.

2

September 29, 1993, Dunn visited Dr. Frank Fondren, an orthopedic surgeon in Mobile, Alabama. Over the following sixteen months, Dr. Fondren prescribed numerous medications and treatment modalities for Dunn, ultimately concluding that he had nothing further to offer her. Dr. Fondren then referred Dunn to his partner, Dr. Jim West, a spine treatment specialist, who determined that Dunn would not benefit from surgery. Thereafter, Dr. Fondren referred Dunn to Dr. Yager.

¶5. In March 1995, Dunn returned to Ingalls in a limited capacity, first, as a secretary, then, at the fuel depot, filling vehicles. On April 19, 1995, Dunn had her first office visit with Dr. Yager. Dr. Yager's first impression was that "[s]he may have radiculopathy on the right. I will check an EMG, NCV as apparently these have not been done. I will try to get the results of previous MRI's, etc. She may well need [a] CT myelogram depending upon the findings." No medication was prescribed to Dunn at this time.

¶6. On May 10, 1995, Dunn had her second office visit with Dr. Yager. By this time, Dunn had stopped working due to pain in her back and down her right leg. After reviewing results of Dunn's EMG and NCV tests, Dr. Yager found only "minor abnormalities[,]" and proposed the following treatment plan:

> I will get a CT myelogram to better define the lesions, if present, in the back and look for surgical problems. However, I am not very optimistic about that. *I will start her on* Robaxin 500 mg b.i.d. and *Tegretol 200 mg advanced after one week to t.i.d. to see if this will help break her pain cycle*.

(Emphasis added.) According to Dunn, in prescribing Tegretol, Dr. Yager asked only if she had any allergies, then instructed her on "[t]he name of the drug and how to take it, the hours

3

in which, how much per day, how many hours in between . . . ." Dunn maintained that Dr. Yager had failed to disclose any of Tegretol's risks or side effects.

¶7.     Conversely, Dr. Yager testified that he had discussed potential side effects, including blurred vision and likely, although "not absolutely certain," a rash. According to Dr. Yager:

> [t]ypically when I . . . prescribe a patient Tegretol, you tell them what it's for, you tell them a few side effects you may have, you tell them they could have *allergic reactions*, and you tell them if anything happens bad, you need to call us, anything you don't understand. Those are typical of any drug used.

(Emphasis added.) While Dr. Yager acknowledged that he did not specifically mention flu-like symptoms, a sore throat, and/or mouth ulcers as possible side effects of a severe reaction to Tegretol, he added that "[t]here is no way" to distinguish between the flu and an adverse reaction.[2] Dunn and Dr. Yager agreed that he also told her, "if you have any problems, call me."

¶8.     Tegretol was manufactured by Ciba-Geigy.[3] By 1995, Tegretol had been approved by the FDA for the treatment of epileptic seizures, but not neuropathic pain. As such, Dr. Yager's prescription was off-label. Multiple expert witnesses testified that in 1995, an off-label prescription of Tegretol for neuropathic pain was common.

¶9.     On May 10, 1995, the Physician's Desk Reference ("PDR") product information regarding Tegretol included the following:

**WARNING**

---

[2] This is significant, because multiple expert witnesses testified that, after the symptoms of SJS begin to manifest, it cannot be stopped. According to Dr. Yager, the treatment of SJS is simply "supportive."

[3] Now, Novartis.

4

APLASTIC ANEMIA AND AGRANULOCYTOSIS HAVE BEEN REPORTED IN ASSOCIATION WITH THE USE OF TEGRETOL. . . . HOWEVER, THE OVERALL RISK OF THESE REACTIONS IN THE UNTREATED GENERAL POPULATION IS LOW, APPROXIMATELY SIX PATIENTS PER ONE MILLION POPULATION PER YEAR FOR AGRANULOCYTOSIS AND TWO PATIENTS PER ONE MILLION POPULATION PER YEAR FOR APLASTIC ANEMIA.

. . .

BECAUSE OF THE VERY LOW INCIDENCE OF AGRANULOCYTOSIS AND APLASTIC ANEMIA, THE VAST MAJORITY OF MINOR HEMATOLOGIC CHANGES OBSERVED IN MONITORING OF PATIENTS ON TEGRETOL ARE UNLIKELY TO SIGNAL THE OCCURRENCE OF EITHER ABNORMALITY. NONETHELESS, COMPLETE PRETREATMENT HEMATOLOGICAL TESTING SHOULD BE OBTAINED AS A BASELINE.[4]

. . .

**WARNINGS**
Patients with a history of adverse hematologic reaction to any drug may be particularly at risk.
*Severe dermatologic reactions including . . . [SJS], have been reported with Tegretol. These reactions have been extremely rare.*[5] *However, a few fatalities have been reported.*

. . .

---

[4]This entire capitalized "WARNING" section is known as the "black-box warning." Dr. Terry Millette, tendered and accepted as an expert in the field of neurology, testified that the potentially life-threatening blood conditions of aplastic anemia and agranulocytosis are unrelated to SJS. Dunn does *not* assert that she contracted aplastic anemia or agranulocytosis.

[5]An SJS reaction was described by experts at trial as "an extremely rare event[,]" "like getting hit by lightning[,]" and "a one-in-a-million occurrence." The incidence rate of SJS in the general population is between 1.2 per 1,000,000 to 6 per 1,000,000. Even Dunn's expert, Dr. Steven Waring (tendered and accepted as an expert in the field of epidemiology), testified that the frequency of various types of severe dermatological reactions (not limited to SJS) occurring among new users of Tegretol between 1975 and 1995 was between 3 per 100,000 and 8 per 100,000.

**PRECAUTIONS**

. . .

**Information for Patients:** Patients should be made aware of the early toxic signs and symptoms of a *potential hematologic problem*, such as fever, sore throat, ulcers in the mouth, easy bruising, petechial or purpuric hemorrhage, and should be advised to report to the physician immediately if any such signs or symptoms appear.

. . .

**Laboratory Tests:** Complete pretreatment blood counts, including platelets and possibly reticulocytes and serum . . . should be obtained as a baseline.[6]

. . .

**ADVERSE REACTIONS**

. . .

The most frequently observed adverse reactions, particularly during the initial phases of therapy, are dizziness, drowsiness, unsteadiness, nausea, and vomiting. To minimize the possibility of such reactions, therapy should be initiated at the low dosage recommended.
*The following additional adverse reactions have been reported*:

. . .

*Skin*: . . . [*SJS*] (see WARNINGS) . . . .

(Emphasis added.)

---

[6]Multiple expert witnesses testified that, despite this manufacturer recommendation, the applicable standard of care did not require pretreatment blood counts for otherwise healthy individuals, as they were of questionable value and not cost-effective. Conversely, Dunn's expert, Dr. John Olson, who was tendered and accepted as an expert in the field of neurology, testified that the failure to complete pretreatment blood counts was a breach of the standard of care. But Dr. Olson also acknowledged that such testing would not have prevented Dunn from contracting SJS.

6

¶10.    At trial, Dr. Yager noted that his decision to prescribe Tegretol was influenced by the fact that Dunn "had this problem for a year and a half . . . . She's not really responded very well to these other treatment modalities, so ideally you would like to try a different modality to try to get her under better control." Multiple other experts testified that the standard of care would not require repeating previously unsuccessful treatment modalities and medications. Another expert for Dunn, Dr. Carroll McLeod, tendered and accepted as an expert in the field of anesthesiology, testified that he may prescribe Tegretol "after I had tried other medications and they had failed."

¶11.    On May 19, 1995, a CT myelogram was performed on Dunn. Later that day, Dunn filled her prescriptions from Dr. Yager for a thirty-day supply of Tegretol and a thirty-day supply of Robaxin at Vancleave Pharmacy in Vancleave, Mississippi. Several days later, Dunn returned to work.

¶12.    On May 26, 1995, Dunn had her third office visit with Dr. Yager. At the time, Dr. Yager was unaware that Dunn had not filled the May 10, 1995, prescription until May 19, 1995. According to Dunn, she questioned Dr. Yager about whether her blood levels should be tested. Dr. Yager responded that, based upon the low dosage prescribed, no such testing was needed, and again instructed Dunn to contact his office if she experienced any problems. Dunn further testified that she had reported feeling sluggish, to which Dr. Yager had "told me that everything would be fine; just not to step up the dosage like he had first prescribed me to do."[7] Dr. Yager's office chart reflected that Dunn's legs were feeling better, but that

_____

[7]Multiple experts testified that the side effect of sluggishness often diminishes over time.

she was experiencing a "possible post myelogram headache." According to Dr. Yager, because Dunn previously had expressed her goal of returning to driving machinery at Ingalls and had "told me she was better on the medication," he did not "think she would have wanted to stop it at that point in time." Accordingly, Dr. Yager modified Dunn's treatment plan and started her on Ultram "advanced to 100 mg b.i.d.[,]" continued her "on the Robaxin 500 mg b.i.d. and Tegretol 200 mg b.i.d.[,]" placed her on a six-day Medrol Dosepak for her headache, and noted that "[s]he will call me in three weeks and let me know [how] she is doing." Dunn acknowledged that Dr. Yager instructed her to "call him if I had any problems."

¶13. On June 13, 1995, Dunn began experiencing flu-like symptoms and "itchy" and "watery" eyes while at work. That evening, Dunn testified that she "began to have a few bumps come up in my mouth, and . . . my left eye was just pouring water or drainage . . . ." Dunn did *not* call Dr. Yager's office. On June 14, 1995, Dunn awoke with continued flu-like symptoms, lesions on her gums, *impaired vision* in her *right eye*, and her *left eye* "*matted . . . closed with mucous*." (Emphasis added.) Rather than contacting Dr. Yager, per his repeated instructions, Dunn went to the Wiggins Clinic, where Dr. Pacita Coss performed an eye examination, suspected a "severe bacterial infection," gave Dunn a shot of Rocephin, and prescribed antibiotics. According to Dr. Coss, she recommended that Dunn remain in the hospital, but Dunn refused.

¶14. On June 15, 1995, Dunn was taken to the emergency room of Stone County Hospital, where Dr. Thomas Lehman diagnosed her with SJS. Dunn's body was covered in blisters and she remained hospitalized for several weeks. As a result of the SJS, Dunn is blind, has

experienced hearing problems, and asserts that her back and leg pain has "[n]ot really" resolved.

¶15.    On April 25, 1996, Dunn filed a Complaint in the circuit court against Hyster Company ("Hyster"); NACCO Industries, Incorporated ("NACCO");[8] Dr. Yager; Dr. Coss; Basel Pharmaceutical ("Basel"); Ciba-Geigy Corporation ("Ciba-Geigy"); Geigy Pharmaceuticals, Incorporated;[9] and Vancleave Pharmacy.  Dunn subsequently filed an Amended Complaint adding the diagnosing physician, Dr. Lehman, as a defendant.  In February 1998, Dr. Lehman filed a "Voluntary Petition of Bankruptcy" in the United States Bankruptcy Court, Southern District of Mississippi,[10] which ultimately resulted in his dismissal from this case on July 1, 2003.  On March 18, 2004, NACCO d/b/a Hyster was dismissed from the case following settlement with Dunn.  On April 26, 2004, Vancleave Pharmacy was dismissed from the case via summary judgment.  On November 19, 2007, the circuit court entered an "Order of Dismissal with Prejudice" as to Basel, Ciba-Geigy, and Geigy Pharmaceuticals following their settlement with Dunn.  On February 25, 2008, the circuit court entered an Order dismissing Dr. Coss with prejudice following her settlement with Dunn.  Therefore, Dr. Yager is the lone remaining defendant.  Dunn asserted:

> three separate theories of fault against Dr. Yager: (1) failure to obtain [Dunn's] informed consent to be treated with Tegretol for back and leg pain; (2) failure

---

[8]According to the Complaint, Hyster and/or NACCO had manufactured the forklift.

[9]According to the Complaint, Basel, Ciba-Geigy, and/or Geigy Pharmaceuticals had manufactured Tegretol.

[10]Between February 1998 and August 2002, the present case was stayed.  In August 2002, the bankruptcy court entered an "Order Authorizing Sharon Dunn to Proceed in Lawsuit Filed in Circuit Court of Jackson County, Mississippi."

to warn [Dunn] of severe life-threatening dermatological, hematological, or hepatic adverse reactions to Tegretol, which manifest themselves in the early stages as flu-like symptoms and/or a decrease in white blood cells; and (3) failure to conduct proper blood work to monitor the effects of Tegretol.

¶16. In October 2004, following the circuit court's "Order Denying Dr. Yager's Motion to Dismiss for Lack of Personal Jurisdiction," this Court granted Dr. Yager's petition for interlocutory appeal. But on March 30, 2006, this Court entered an Order dismissing that petition as "improvidently granted." In so ruling, this Court noted that "the dismissal is not a ruling on the merits of any issue raised by the petition." On June 15, 2006, this Court denied Dr. Yager's "Motion for Rehearing" regarding the dismissal of his petition.

¶17. A jury trial commenced on December 1, 2008. Following twenty days of trial and nearly three hours of deliberation, the jury found in favor of Dr. Yager. Following the circuit court's denial of Dunn's "Motion for Judgment Notwithstanding the Verdict, Relief from Judgment and New Trial" proceeds Dunn's direct appeal and Dr. Yager's cross-appeal on the issue of personal-jurisdiction.

## ISSUES[11]

¶18. On cross-appeal, Dr. Yager raised the following jurisdiction issue, which this Court considers first:

> I. Whether a Mississippi court may properly exercise personal jurisdiction over Dr. Yager, an Alabama resident.

This Court next considers the following issues raised by Dunn on direct appeal:

---

[11]In the interest of analytical clarity, this Court has reordered and restated the issues presented on appeal by Dunn and on cross-appeal by Dr. Yager.

10

II. Whether, under Article 3, Section 25 of the Mississippi Constitution, the circuit court erred in precluding Dunn from addressing the jury during closing argument.
III. Whether the circuit court abused its discretion in denying Dunn's motion to substitute an expert.
IV. Whether the circuit court abused its discretion in precluding Dunn from using the video deposition of neurologist Dr. Harry Gould.
V. Whether the circuit court erred in disclosing to the jury the fact that Dunn had settled with other defendants.
VI. Whether the circuit court's jury instructions regarding "informed consent" were erroneous.
VII. Whether the circuit court abused its discretion in precluding Dunn from introducing excerpts from the 2009 Physician's Desk Reference.

## ANALYSIS

I.    **Whether a Mississippi court may properly exercise personal jurisdiction over Dr. Yager, an Alabama resident.**

¶19.    Dr. Yager's "Answer to Complaint" provided that:

[t]his [c]ourt lacks in personam jurisdiction over [Dr. Yager] because, among other things, [Dr. Yager] was not and is not doing business within the State of Mississippi and all of [Dr. Yager's] medical care and treatment relating to [Dunn] took place in the State of Alabama. Therefore, this complaint should be dismissed . . . .

Dr. Yager's subsequent "Responses to Interrogatories," filed on June 20, 1996, provided that "[p]robably less than 5%" of his practice over the past ten years had consisted of patients from Mississippi;[12] he treated only Mississippi patients who "called for appointments or were referred from other physicians[;]" he had never solicited any business in Mississippi in the previous ten years; and he had never performed any medical services in Mississippi.

---

[12]In Dr. Yager's "Second Supplemental Responses to Interrogatories," he reduced that figure to only "as high as 2.36%."

¶20.   On March 2, 1999, Dr. Yager filed a "Motion for Summary Judgment for Lack of Personal Jurisdiction."  Dr. Yager's affidavit, attached to the motion, provided that he was licensed to practice in Alabama, practiced exclusively in Alabama, and had never practiced medicine in Mississippi.  The affidavit asserted that Dr. Yager does not "solicit business" in Mississippi "through any means[;]" has never lived, or owned real or personal property, in Mississippi; and "do[es] not retain anyone as an agent in any capacity" in Mississippi. According to Dr. Yager, his only contact with Dunn occurred in Alabama, following her referral by Dr. Fondren.  As such, Dr. Yager asserted that he had not "purposefully availed [him]self of the Mississippi courts."

¶21.   However, Dr. Yager's "Supplemental Responses to Interrogatories," reveals he accepted health insurance payments from insurers who "may insure residents from states other than Alabama, and which may include Mississippi."  The affidavit of Nan Wallis, vice-president and co-owner of PPOplus, a preferred-provider organization ("PPO"), presented a slightly different picture, in that:

> [b]ased upon my experience, for a physician whose practice is generally covered by insurance, . . . the most effective means of building a patien[t] base is through membership in [PPOs] and other managed care organizations. Traditional marketing, such as television, radio, and yellow pages, is typically not as effective due to the pricing incentives available for participating members.

The record reveals that Dr. Yager was a participating member of PPOs servicing Mississippi residents, including Gulf Health Plans,[13] Private Healthcare Systems,[14] and Beech Street

---

[13]The affidavit of Kerry D. Goff, the president of Gulf Health Plans, provided that Dr. Yager first entered into a "Participating Physician Agreement" in 1992.  According to Goff, "[u]nder the Participating Physician Agreement, [Dr. Yager] authorized [Gulf Health Plans]

Corporation.[15]  An affidavit of Nita Moore, the "legal coordinator" for Blue Cross Blue Shield of Mississippi ("BCBS-MS"), provided that Dr. Yager and other physicians of the Center, in which Dr. Yager had a one-third shareholder interest, "are listed as physician providers in the [BCBS-MS] directory of providers for *Mississippi residents* under the heading of out of state providers and/or Gulf Health Plan providers . . . ." (Emphasis added.) That affidavit stated that "the health care providers that are made available to BCBS-MS policyholders agree to: [d]iscounted medical services; [f]ile claims for policy holders; [a]ccept [BCBS-MS] payment, plus any deductible, co-insurance and co-payment when applicable, as payment in full for covered services; and [p]articipate in utilization management programs." According to Moore, BCBS-MS "is the largest provider of health insurance in the State of Mississippi with an approximate average annual membership of more than 800,000 members." Moore's affidavit added that, from 1994 to 2004, BCBS-MS "paid claims submitted by Dr. Yager and other physicians of the [Center] . . . totaling $126,732.82 for the 1,228 occasions on which physicians of the [Center], including Dr. Yager, provided treated to members of the BCBS-MS network." Attached to Moore's affidavit was a document summarizing the fees paid by BCBS-MS to Dr. Yager, which

to enter into agreements (directly or indirectly) with payors, health plans or networks of payors or health plans on his behalf."

[14]The affidavit of George S. Moran, the "Executive Vice President, Networks, of Private Healthcare Systems," stated that Dr. Yager had been listed as a participating provider since December 1, 1993, and that, as of 2000, "the estimated number of covered employees in the State of Mississippi . . . is 5600."

[15]According to the affidavit of Janice Mandolesi, an employee of Beech Street Corporation, "approximately [4,000] Mississippi employees are covered by health plans participating in the Beech Street PPO Network."

totaled $18,918. Finally, the affidavit of Melzana Fuller, the "Bureau Director for Provider and Beneficiary Relations" for the Mississippi Division of Medicaid, stated that from January 16, 1989, through August 31, 1995, "Medicaid provider files [were] established and maintained for" Dr. Yager. Thus, Dr. Yager's averment that he was "not doing business" in Mississippi is dubious at best, given his involvement not only with health-care providers and insurers, but also the government of Mississippi.

¶22. With regard to Dr. Yager's treatment of Dunn, the April 19, 1995, note of Dr. Yager's office provided "[r]esponsible party: F.A. Richard (Litton Shipbuilding)." That note further listed "F.A. Richard, P.O. Box 1728, Pascagoula, Mississippi, 39567," as the insurance company under the "Workmen's Comp Only" section for "Claim [Number] I930770243."[16] The May 10, 1995, note of Dr. Yager's office provided that "Dr. Yager approved pay Ross McBride/F.A. Richard." Finally, Dr. Yager's May 19, 1995, office chart stated that the "CT myelogram - lumbar spine" has been "approved by Robbie Harrison . . . F.A. Richard."

¶23. On August 27, 2004, the circuit court held a hearing on Dr. Yager's "Motion to Dismiss for Lack of Personal Jurisdiction." Regarding the Mississippi long-arm statute, the circuit judge determined that:

> I'm reading from [***Horne v. Mobile Area Water & Sewer System***, 897 So. 2d 972 (Miss. 2004)] – Mississippi's Long-Arm Statute contains no requirements that the part of the tort which causes the injury be committed in Mississippi. This is true because an injury is necessary to complete a tort. . . . This [c]ourt finds that, in fact, *the injury of [Dunn] did, in fact, occur in [Mississippi], and that, in fact, that part of the tort which caused the injury, was committed in Mississippi. . . . That's, in fact, where she lost her sight and did not go back to Dr. Yager; therefore, the Long-Arm Statute applies*.

---

[16]According to Dunn, F.A. Richard was the "third-party administrator" for Ingalls.

14

(Emphasis added.) As to due process, the circuit judge noted that "we are in a geographic area that has historically, economically, and commercially had ties to the other [Mississippi and Alabama], although there is a state line through there." The circuit judge added that over the past thirty years, "[d]octors, as well as our profession had to begin the process of reaching out further and further for clients, business and profits. Patients cross [the] state line frequently, back and forth." In concluding that the circuit court had personal jurisdiction over Dr. Yager, the circuit judge found that Dr. Yager's payments with respect to Dunn "came from F.A. Richard[,] . . . an insurance company . . . at Ingalls, situated in Pascagoula[;]" that Dr. Yager had "joined Mississippi Medicaid" between 1989 and 1995; that advertisements placed in *The Mobile Press-Register* by the Center were "circulated in this community[;]" that Dr. Yager "cannot hide behind th[e] fact" that the Center is not a party "because he is a part owner and shareholder[;]" and, finally, that "[t]he actions by [Dr. Yager] with respect to PPOs, the insurance companies, et cetera, were purposely directed to [Mississippi], and *there's no way that this [c]ourt can find the intent is not to get patients from the State of Mississippi*. Fundamental fairness, Mobile is 30 miles from Pascagoula." (Emphasis added.) On September 2, 2004, the circuit court entered its "Order Denying Dr. John G. Yager's Motion to Dismiss for Lack of Personal Jurisdiction."

¶24. As noted in ¶ 16 *supra*, this Court subsequently dismissed Dr. Yager's petition for interlocutory appeal of the circuit court's ruling as "improvidently granted." On August 14, 2008, Dr. Yager filed a "Motion to Reconsider Order Regarding Personal Jurisdiction" relying, in part, upon a "Separate Written Objection" to this Court's Order dismissing the interlocutory appeal. At the hearing, the circuit judge stated:

15

[t]his [c]ourt is certainly not oblivious to the ramifications of its ruling on jurisdiction. The [c]ourt understands how it can and probably is having a chilling effect on Mobile County doctors. However, . . . [t]he [c]ourt can't overlook those matters that were set out that Dr. Yager and/or [the Center] did. . . . [T]he medical profession, like the legal profession, is changing and has changed. And it appears to me that ***Horne*** is an implicit acknowledgment of that change. And *that may be chilling, but that may be the price that we professionals, legal or medical, may make when we decide to expand practices, go into other jurisdictions, et cetera*; so that motion is overruled.

(Emphasis added.) On September 4, 2008, the circuit court entered its "Order Denying Defendant's Motion to Reconsider Order Regarding Personal Jurisdiction."

¶25. A de novo standard of review applies to the issue of whether a Mississippi court has personal jurisdiction over an Alabama resident. *See **Sealy v. Goddard***, 910 So. 2d 502, 506 (Miss. 2005) (citing ***Tel-Com Mgmt., Inc. v. Waveland Resort Inns, Inc.***, 782 So. 2d 149, 151 (Miss. 2001)). "The proper order when analyzing personal jurisdiction over non-resident defendants is to first consider whether the long-arm statute subjects a nonresident defendant to personal jurisdiction and then to consider whether the statute's application to that defendant offends the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." ***Estate of Jones v. Phillips***, 992 So. 2d 1131, 1137 (Miss. 2008).

### A. Long-arm statute

¶26. Mississippi Code Section 13-3-57 provides, in pertinent part, that:

[a]ny nonresident person . . . who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

16

Miss. Code Ann. § 13-3-57 (Rev. 2002). Accordingly, there are "three activities" which will permit Mississippi courts to exercise personal jurisdiction over a nonresident defendant: "(1) if that person has entered into a contract to be performed in Mississippi; (2) has committed a tort in Mississippi; or, (3) is conducting business in Mississippi." *Yatham v. Young*, 912 So. 2d 467, 469-70 (Miss. 2005). Regarding application of the long-arm statute to Dr. Yager, this Court has to go no further than analyzing the tort prong, which is dispositive.

¶27. This Court has stated that:

> "[u]nder now well established law, Mississippi's long-arm statute contains no requirement that the part of the tort which causes the injury be committed in Mississippi." *Sorrells v. R&R Custom Coach Works, Inc.*, 636 So. 2d 668, 672 (Miss. 1994). Rather, *for purposes of our long-arm statute, a tort is committed in Mississippi when the injury results in this State*. *Id*. This is true because an injury is necessary to complete a tort. *Id*.

*Horne*, 897 So. 2d at 977 (emphasis added). *See also Yatham*, 912 So. 2d at 470; *Flight Line, Inc. v. Tanksley*, 608 So. 2d 1149, 1157 (Miss. 1992) ("[t]orts arise from breaches of duties causing injuries, and it is common experience that breach and causation and impact do not all always happen at once"). But "consequences stemming from the actual tort injury do not confer personal jurisdiction at the site or sites where such consequences happen to occur." *Allred v. Morris & Peterson*, 117 F.3d 278, 282 (5th Cir. 1997) (quoting *Jobe v. ATR Mktg., Inc.*, 87 F.3d 751, 753 n.2 (5th Cir. 1996)). *See also Bufkin v. Thermage, Inc.*, 2009 WL 114780, at *4 (S.D. Miss. 2009) ("[t]he line between what constitutes actual injury and what are mere consequences of an injury can at times be difficult to locate precisely.").

¶28. In *Horne*, the defendants released water from an Alabama reservoir which flowed into Mississippi and allegedly "caused damage and/or destruction to the real and personal

17

property of more than 350 Jackson County[, Mississippi] property owners." ***Horne***, 897 So. 2d at 974. Based thereon, this Court concluded that the Mississippi property owners "suffered a tort in Mississippi for purposes of the long-arm statute because the plaintiffs' property was damaged inside the boundaries of this State." ***Id***. at 977.

¶29. According to Dr. Yager, "the alleged tort occurred when [he] allegedly failed to obtain informed consent for prescribing Tegretol, when he allegedly failed to warn [Dunn] of the dangers of Tegretol, and when he continued to prescribe Tegretol without a finding of a neurogenic origin for [Dunn's] pain[,]" all of which occurred in Alabama. Dr. Yager attempts to distinguish ***Horne*** by arguing that Dunn's "symptoms from [SJS] simply manifested in Mississippi[,]" and that result was not a "direct consequence" of his actions, as he "did not arrange for the prescription to be filled in Mississippi."

¶30. Dunn responds that because her injuries "took place exclusively in Mississippi, Dr. Yager committed a tort in this state within the meaning of the Mississippi long-arm statute." Dunn specifically notes that she filled the Tegretol prescription at Vancleave Pharmacy in Vancleave, Mississippi; ingested the medication at home and work exclusively in Mississippi; and suffered the effects of SJS in Mississippi. In short, she asserts that her "cause of action did not accrue until she ingested the Tegretol and sustained an adverse reaction."

¶31. "[F]or purposes of our long-arm statute, a tort is committed in Mississippi when the injury results in this State." ***Horne***, 897 So. 2d at 977 (citing ***Sorrells***, 636 So. 2d at 672). This Court concludes that Dunn's actual injury, not the mere consequences thereof, occurred in Mississippi. Dunn filled the prescription in Mississippi, consumed the prescription drugs

18

in Mississippi, and the effects of her injury were suffered in Mississippi. Accordingly, this Court concludes that the circuit court did not err in finding that the long-arm statute applies to Dr. Yager.

### B. Due Process

¶32. The United States Supreme Court has stated that:

> due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)). This inquiry involves "two considerations: (1) the extent and quality of the contacts of the defendant with the forum state and, assuming sufficient minimum contacts exist, (2) whether the maintenance of the suit in the forum state offends traditional notions of fair play and substantial justice." *Phillips*, 992 So. 2d at 1140 (citing *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113-15, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)). *See also Med. Assurance Co. of Miss. v. Jackson*, 864 F. Supp. 576, 578 (S.D. Miss. 1994) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985)) ("the focus of the due process inquiry is on whether the nonresident, by virtue of his contact(s) with the forum state, can be said to have 'purposely availed himself of the benefits and protections of' the forum's laws").

*(1) Minimum contacts*

¶33.   "Minimum contacts" are more than mere "fortuitous" contacts and "must be between the defendant and the forum state, not simply between the defendant and a resident of the forum state." *Admin. of Tulane Educ. Fund v. Cooley*, 462 So. 2d 696, 703 (Miss. 1984) (quoting *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 n.3 (8th Cir. 1979)).  "Historically, minimum contacts have been split into two types: those which invoke specific jurisdiction over a defendant and those that lead to general jurisdiction over a defendant." *Id*.   As either will suffice, regarding Dr. Yager's minimum contacts with Mississippi, this Court finds the subject of *general* personal jurisdiction dispositive.

¶34.   This Court "may exercise general jurisdiction over a nonresident defendant when the cause of action does not arise out of or relate to the defendant's activities in the forum state as long as the defendant's contacts with the forum are systematic and continuous." *Phillips*, 992 So. 2d at 1141 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415-18, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)).   Such contact should be "calculated rather than fortuitous and regular and continuous rather than sporadic or isolated." *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987), *superseded by statute on other grounds as stated in Kekko v. K&B Louisiana Corp.*, 716 So. 2d 682, 683 (Miss. Ct. App. 1998).

¶35.   Dr. Yager was an approved Mississippi Medicaid provider from January 1989 through August 1995.  As Fuller's affidavit provided, during this period, Mississippi "Medicaid provider files [were] established and maintained for" Dr. Yager.  Furthermore, since 1992, Dr. Yager had participated in various PPOs which, *inter alia*, gave him access to more than 800,000 members of BCBS-MS as prospective clients.  In addition, Dr. Yager solicited

20

patients through the PPOs, as an approved preferred provider. Finally, Dr. Yager's treatment of Dunn was itself approved by F.A. Richard, based in Pascagoula, Mississippi, which acted as the "[r]esponsible party" and insurance company under the "Workmen's Comp Only" section for Dunn's claim. Under the totality of these circumstances, this Court concludes that Dr. Yager had "systematic and continuous" contacts with Mississippi. *Phillips*, 992 So. 2d at 1141 (citing *Helicopteros*, 466 U.S. at 415-18). Therefore, the circuit court properly concluded that sufficient minimum contacts existed with Mississippi to exercise personal jurisdiction over Dr. Yager.

*(2) Fair play and substantial justice*

¶36.    The United States Supreme Court has stated that:

> the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum [s]tate, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal*, 480 U.S. at 113 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

¶37.    According to Dr. Yager, "[s]ound public policy demands that doctors not be forced to first ask where a patient is from prior to providing treatment." He contends that a finding that he is subject to personal jurisdiction in Mississippi will not only "have a chilling effect on the ability of Mississippi residents to seek health care[,]" but also that "Mississippi physicians treating non-resident patients would be subject to jurisdiction in the patients' home states." Dunn responds that "Mississippi has an interest in adjudicating disputes

21

involving its injured residents[;]" that "[t]he interstate judicial system interest is not diminished nor is a significant burden imposed on any party due to th[e] proximity of Dr. Yager's place of business and the forum county[;]" and that any potential "chilling effect" is outweighed by Mississippi's interest in "protecting its citizens from tortious injury by health care providers."

¶38. Regarding the interest of the forum state, *Horne* reasoned that "Mississippi has a strong interest in adjudicating the dispute because Mississippi residents were injured . . . ." *Horne*, 897 So. 2d at 981. Similarly, this Court finds that Mississippi has an interest in adjudicating a dispute in which its resident, Dunn, suffered physical injury. This interest is particularly compelling when the alleged tortfeasor is in Mobile, Alabama, an area which, as noted by the circuit court, has numerous historic, economic, and commercial ties with South Mississippi. Relatedly, the geographic proximity involved in this specific case also weighs in favor of Dunn as to the burden on the defendant and the interest in the most efficient resolution of controversies. Stated succinctly, this case involves a physician from Mobile, Alabama, not Missoula, Montana, the Mayo Clinic in Rochester, Minnesota, or the MD Anderson Cancer Center in Houston, Texas. *See id.* (the defendants were located "only 12 miles from Mississippi."); *BankPlus v. Toyota of New Orleans*, 851 So. 2d 439, 444 (Miss. Ct. App. 2003) ("[s]ince Jarrell and BankPlus are located in Pearl River County and New Orleans is not that far from the forum, it is efficient to have the trial in Pearl River County and does not place any unreasonable burden on Toyota"); *Am. Cable Corp. v. Trilogy Commc'ns, Inc.*, 754 So. 2d 545, 552 (Miss. Ct. App. 2000) ("[t]he burden upon American Cable does not appear substantial, as it is not a great distance from Florida to

22

Mississippi."). Moreover, given this geographic proximity and Dr. Yager's contacts with Mississippi, including his PPO participation and prior status as a Mississippi Medicaid provider, he reasonably could expect to be sued by a Mississippi patient in Mississippi. *See BankPlus*, 851 So. 2d at 445 ("[i]t was also a reasonable expectation that BankPlus would sue in the county in which it is located . . . "). Regarding "fundamental substantive social policies," this Court has stated "[t]hat a non-resident may threaten to terminate contacts with a given state in no way enhances its due process rights beyond the formulations provided in *International Shoe* and its progeny." *Cooley*, 462 So. 2d at 705.

¶39. Our holding is restricted to the facts of this specific case, as "[n]othing in the record suggests this trial was an inefficient method of resolving this dispute or that it imposed an undue burden to have [Dr. Yager] defend the suit in Mississippi." *Phillips*, 992 So. 2d at 1142. Therefore, this Court concludes that the circuit court did not err in finding that "traditional notions of fair play and substantial justice" were not offended in exercising personal jurisdiction over Dr. Yager. *Int'l Shoe*, 326 U.S. at 316. Future cases must be based on the facts peculiar to such cases to insure that *International Shoe*'s mandate is honored.

¶40. In sum, this Court concludes that the long-arm statute, under its tort prong, subjected Dr. Yager to the jurisdiction of the circuit court, and that its application does not offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Accordingly, this issue is without merit.

**II.** **Whether, under Article 3, Section 25 of the Mississippi Constitution, the circuit court erred in precluding Dunn from addressing the jury during closing argument.**

¶41. Near the conclusion of Dunn's rebuttal closing argument, counsel for Dunn stated to the circuit court, for the first time and in the presence of the jury, "I'd like [Dunn] *to tell you what the testimony was that she gave at this trial*. So, pursuant to [Article 3, Section 25 of] the Mississippi Constitution, I would like . . . [Dunn] *to comment on her testimony at trial*." (Emphasis added.) Following objection by Dr. Yager, the circuit judge concluded:

> in 1976, when I prosecuted Jimmy Lee Grafe for the murder of a three-year-old girl, Judge Palmer would not let him, at closing address . . . the jury. The Supreme Court reversed; *but that is in a criminal case only. It's not applicable to the civil case*, and it's overruled.

(Emphasis added.)

¶42. "The standard of review this Court employs for constitutional issues is de novo." *Deeds v. State*, 27 So. 3d 1135, 1141 (Miss. 2009) (citing *Thoms v. Thoms*, 928 So. 2d 852, 855 (Miss. 2006)). In *criminal* cases, "the accused shall have a right *to be heard by himself or counsel, or both* . . . ." Miss. Const. art. 3, § 26 (emphasis added). This Court has held that this constitutional provision entitles a *criminal* defendant "to personally argue his case to the jury and refusal to allow him to do so is reversible error." *Ballard v. State*, 366 So. 2d 668, 668 (Miss. 1979) (citing *Gray v. State*, 351 So. 2d 1342 (Miss. 1977)). In *Ballard*, the circuit court's error pertained to its refusal to allow Ballard "to personally make a portion of the closing argument to the jury." *Ballard*, 366 So. 2d at 668.

¶43. In *civil* actions, "[n]o person shall be debarred *from prosecuting* . . . for . . . him or herself, before any tribunal in the state, *by him or herself, or counsel, or both*." Miss. Const.

24

art. 3, § 25 (emphasis added). This Court has never spoken to whether this constitutional provision guarantees a *civil* litigant the right to address the jury in closing argument.

¶44. Dunn argues that Article 3, Section 25 is "nearly identical to" Article 3, Section 26, therefore, it "was designed to ensure a party's right to counsel and to proceed *pro se* jointly just as if [Dunn] was a criminal defendant." Alternatively, Dunn newly contends that "surely the right to 'prosecute' one's case encompasses the right to make argument to the jury during closing argument[,]" and that the "plain meaning" of the term "both" necessarily extends that right to Dunn and her counsel.[17]

¶45. In response, Dr. Yager emphasizes that Article 3, Section 25 "does not include any specific right to be heard . . . ." According to Dr. Yager, Dunn "was not prevented from prosecuting her case. She was represented by able counsel and testified extensively in presenting her case to the jury." Moreover, Dr. Yager notes that Dunn made the strategic decision not to testify during her rebuttal case, wherein she could have controverted Dr. Yager's testimony regarding the warnings, *vel non*, she did or did not receive, albeit subject to cross-examination. According to Dr. Yager, Dunn was instead "attempting to circumvent further cross-examination by testifying to the jury in closing arguments." Finally, Dr. Yager asserts that Dunn suffered no prejudice in having her counsel perform closing argument.

¶46. While this Court previously has held that the "right to be heard" enumerated in Article 3, Section 26 includes the right of a criminal defendant to participate in closing argument, its relevance to Article 3, Section 25 is debatable because of the linguistic differences

---

[17]At trial, Dunn's request was only to repeat and comment upon her trial testimony, not argue the righteousness of her case.

25

between the two provisions. *See **Ballard***, 366 So. 2d at 668; Miss. Const. art. 3, § 26. "The construction of a constitutional section is . . . ascertained from the plain meaning of the words and terms used within it . . . . If there be no ambiguity, there . . . exists no reason for legislative or judicial construction." ***Ex parte Dennis***, 334 So. 2d 369, 373 (Miss. 1976). Article 3, Section 25 provides, in pertinent part, that a civil litigant may not be "debarred from prosecuting . . . by him or herself, or counsel, or both." Miss. Const. art. 3, § 25. To "debar" means "1. To bar or exclude: shut out. 2. To forbid, hinder, or prevent." *Webster's II New College Dictionary* 290 (1995). To "prosecute" means "1. To pursue or persist in so as to finish. . . . 3.a. To initiate legal or criminal court action against. b. To seek to enforce or obtain by legal action." *Id*. at 888. *See also Black's Law Dictionary* 1385 (4th ed. 1968) (defining "prosecute" as "[t]o follow up; to carry on an action or other judicial proceeding; to proceed against a person criminally. To 'prosecute' an action is not merely to commence it, but includes following it to an ultimate conclusion."). Thus, the plain language of Article 3, Section 25 lends itself to permitting a civil litigant, his or her counsel, or both, not only from commencing the legal action, but also bringing it to completion.

¶47.     Therefore, although Dunn was constitutionally entitled to participate in closing argument, the untimeliness and method by which Dunn sought to participate was impermissible.[18] *See **Hyundai Motor Am. v. Applewhite***, 53 So. 3d 749, 759 (Miss. 2011) ("[w]e do not condone trial by ambush."). In civil trials, since the plaintiff carries the burden of proof, closing arguments are divided into three segments: the plaintiff opens, followed by

----

[18]This required the learned circuit judge to make an immediate ruling, before the jury, on a constitutional matter of first impression.

the defendant's argument, and concluding with the plaintiff's rebuttal argument. *See* Jacob A. Stein, *Closing Arguments*, § 1:6 (2d ed. 2005) ("as to the order of argument at the close of the evidence in a civil trial, it usually falls upon counsel for the plaintiff to make a full opening argument touching on every point he or she wishes to cover. Counsel for the defendant then answer[s] the argument while also touching on the merits of his or her proof and may attempt to anticipate further argument by plaintiff's counsel. Counsel for the plaintiff is then afforded opportunity to make rebuttal argument during which he or she replies to and rebuts the argument made by the defendant."); Stanford Young, *Mississippi Trial Handbook*, § 33:3 (2d ed. 1995) ("[t]he right to open and close the argument is normally with the party having the burden of proof."); URCCC 10.03 (in criminal proceedings, "[a]t the conclusion of the evidence, the prosecution may make an argument to the jury. The defendant may then make an argument to the jury. . . . The state may then make a rebuttal argument . . . ."). In this case, despite years of opportunity, Dunn never timely sought to exercise her right to participate as her own counsel. Dunn notified the circuit court of her desire to act as her own counsel, jointly with retained counsel, only when retained counsel neared the end of Dunn's rebuttal argument. However, we recognize that, heretofore, with the exception of Uniform Circuit and County Court Rule 8.05, no rule of procedure provides guidance for participation in closing argument by a party, civil or criminal. *See* URCCC 8.05. Thus, Dunn was entitled to participate in her closing argument, provided that she complied with the same rules applicable to her lawyer. Our rules of procedure and courtroom protocol should not be relaxed or modified for *pro se* participants in civil cases, any more than in a criminal case. *See* URCCC 8.05(3.) (even *pro se*

27

defendants are bound by "the rules of evidence, procedure or courtroom protocol . . . ."). During closing argument, rebuttal is strictly limited to providing a response to issues addressed in the defendant's closing argument. However, when announcing Dunn's intention to personally participate, her attorney declared that she would "repeat" her testimony, not rebut arguments made by the defendant. Should a civil litigant desire to act as her own counsel and participate in the proceedings, there must first be timely notice to the court and the opposing party of such intention. Such timely notice may be evidenced by an entry of appearance, motion, or inclusion in a case-management or pre-trial order. Thereafter, the *pro se* litigant must follow the procedure and courtroom protocol required of counsel in every other case.[19] Under the facts and circumstances presented, the circuit court properly excluded Dunn from participating in rebuttal argument after her counsel had commenced such argument, albeit for the wrong reason. *See **Green v. Cleary Water, Sewer & Fire Dist.***, 17 So. 3d 559, 572 (Miss. 2009) (citations omitted) ("[i]t is well established in our jurisprudence that the right result reached for the wrong reason will not be disturbed on appeal"). Accordingly, this issue is without merit.

### III. Whether the circuit court abused its discretion in denying Dunn's motion to substitute an expert.

¶48.    On July 22, 2004, more than eight years after Dunn had filed her 1996 Complaint, a "Case Management Order" was entered by the circuit court, stating:

---

[19]So as to ensure that the civil litigant understands this standard, the trial court is advised to instruct the civil litigant as such, and provide the mandatory instructions and risks as are given to *pro se* defendants in criminal cases. *See* URCCC 8.05(3).

the deadlines established herein, having been *established with the participation of all parties, can be modified only by order of the court upon a showing of good cause . . . .*

. . .

1. *Plaintiff shall designate her experts by August 20, 2004.*
2. Defendants shall designate their experts by September 20, 2004.
3. *Plaintiff shall designate any rebuttal experts by October 5, 2004.*

. . .

*A rebuttal expert shall be limited to a field of expertise designated by any defendant for which plaintiff does not designate an expert.*

(Emphasis added.) Dunn provided a timely "Expert Designation" as to Dr. John Olson, a neurologist licensed to practice in Louisiana. Dr. Olson's attached curriculum vitae provided that he was "[b]oard [e]ligible[,]"[20] had been "tendered as an expert witness in a number of different courts[,]" and had "never been turned down with respect to expertise in neurology." According to Dr. Olson's attached affidavit, in his opinion, Dr. Yager's treatment and care of Dunn fell below the applicable standard of care.

¶49. After the "Case Management Order" deadline expired, Dunn filed "Expert Rebuttal Designations" which included Dr. Stanley Malkin, a board-certified neurologist. In response, Dr. Yager filed a "Motion to Strike Plaintiff's 'Rebuttal Witnesses,'" contending, in pertinent part, that Dr. Malkin was "merely repeating . . . the anticipated testimony of [Dunn's] previously identified expert, [Dr. Olson], a neurologist." On August 24, 2006, the circuit court entered an "Order Granting in Part Defendants' Motion to Strike Plaintiff's Rebuttal Experts" which concluded that "[h]aving already designated an expert in the field of

_____

[20]At trial, Dr. Olson testified that he twice had failed the oral portion of the board examination.

29

neurology, the Plaintiff's designation . . . *clearly falls outside the ["Case Management Order"] definition of a 'rebuttal expert'* . . . and will be stricken for that reason." (Emphasis added.)

¶50. On September 8, 2006, Dunn filed a "Motion for Reconsideration or, Alternatively, to Substitute." According to Dunn, only after designating Dr. Olson as an expert did she further investigate Dr. Olson's qualifications. That investigation revealed that, in 1998, his Louisiana medical license was made "conditional/limited" by the Louisiana State Board of Medical Examiners based upon his issuance of long-term prescriptions for Vicodin or other controlled substances without "legitimate medical justification" or in a manner contrary to the prevailing standards of practice in Louisiana. Dunn's motion asserted that substitution "would cure the prejudice [Dunn] will no doubt suffer if she is unable to respond to challenges to Dr. Olson's qualifications[,]" and "will not prejudice Defendants. The designations of both Drs. Olson and Malkin were *virtually identical* . . . ." (Emphasis added.)

Dr. Yager filed an objection to Dunn's motion, maintaining that she:

> has known for a long time that Dr. Olson is not board certified in neurology. . . . Dr. Olson has made that fact clear through his [curriculum vitae] which has been tendered for years. There is no surprise. . . . The rules do not contemplate substitution of expert witnesses simply because of evidence obtained with which the expert is cross-examined.

On September 29, 2006, the circuit court entered an "Order Denying Plaintiff's Motion for Reconsideration or, Alternatively, to Substitute." According to the circuit court:

> [t]he Case Management Order was presented as an agreed proposed Order. When this [c]ourt signed that Order, it was not a suggestion. It was an Order. [Dunn] identified [Dr. Olson] in time and in compliance with this [c]ourt's Case Management Order which governs the timing of identification of expert

witnesses. [Dr. Malkin] was identified outside the restrictions imposed by this Case Management Order.

Thereafter, this Court entered an Order denying Dunn's petition for interlocutory appeal of that ruling. At trial, Dr. Olson was tendered and accepted as an expert in the field of neurology, over the objection of Dr. Yager.

¶51. "Trial courts have considerable discretion in discovery matters, and . . . will not be overturned unless there is an abuse of discretion." *Beck v. Sapet*, 937 So. 2d 945, 948 (Miss. 2006) (citing *Robert v. Colson*, 729 So. 2d 1243, 1245 (Miss. 1999)). *See also Bowie v. Montfort Jones Mem'l Hosp.*, 861 So. 2d 1037, 1042 (Miss. 2003) ("[o]ur trial judges are afforded considerable discretion in managing the pre-trial discovery process in their courts, including the entry of scheduling orders setting out various deadlines to assure orderly pre-trial preparation resulting in timely disposition of the cases").

¶52. *Bowie* addressed "the failure to comply with a trial court's order concerning the time frame for the completion of discovery." *Id*. Specifically, "[p]ursuant to the provisions of the scheduling order, the plaintiffs were to designate their expert by December 31, 2000, which came and passed uneventfully without any expert designation by the plaintiffs." *Id*. Due to the plaintiffs' failure timely to designate a medical expert, they "could not make out a prima facie case of medical malpractice[,]" and summary judgment was granted in favor of the defendants. *Id*. at 1043. In affirming, this Court stated that "[o]ur trial judges . . . have a right to expect compliance with their orders, and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril." *Id*. at 1042. This Court added that:

> *[w]hile the end result . . . may appear to be harsh, litigants must understand that there is an obligation to timely comply with the orders of our trial courts.* As we noted in [***Guaranty National Insurance Company v. Pittman***, 501 So. 2d 377 (Miss. 1987)], the parties must take seriously their duty to comply with court orders. "At some point the train must leave." [***Id***. at 389]. That point was reached in today's case on December 31, 2000.

***Bowie***, 861 So. 2d at 1043 (emphasis added).

¶53.    Dunn asserts that she was prejudiced by the circuit court's refusal to allow her to designate another neurology expert, Dr. Malkin. Specifically, Dunn maintains that "[w]hile Dr. Olson's curriculum vitae and affidavit may have provided [her] notice that he was not board-certified, the documents did not alert [her] counsel to any past disciplinary action against him or restriction on his license." According to Dunn, this "inadvertent oversight" renders the circuit court's ruling an abuse of its discretion "because at the time the motion to substitut[e] Dr. Malkin was denied: (1) no neurology experts had been deposed; (2) no trial date existed; (3) Dr. Malkin's proposed testimony was identical to Dr. Olson's . . . ; and (4) Dr. Yager did not claim any prejudice would result from the substitution."

¶54.    In response, Dr. Yager argues that it is undisputed that Dr. Malkin was not a rebuttal witness. Dr. Malkin was designated more than fifty days after the deadline set by the "Case Management Order" for the designation of Dunn's expert witnesses. Moreover, Dr. Olson "was tendered as an expert in neurology by [Dunn], was accepted as such by the trial court, and did in fact testify as an expert in the field of neurology over the objections of Dr. Yager." As such, Dr. Yager maintains that Dunn "is essentially asking this Court to reverse the [c]ircuit [c]ourt's decision to strike the designation of Dr. Malkin because Dr. Olson was . . . a lousy witness."

¶55.    Dr. Olson had been involved in this case for six years prior to his designation as an expert in August 2004.  This provided ample time for Dunn to investigate Dr. Olson's background and qualifications.  Moreover, Dunn's attempted designation of Dr. Malkin, a designation that she admits was "virtually identical" to that of Dr. Olson, occurred more than fifty days after the deadline for expert designation imposed by the "Case Management Order."[21]  This Court has stated that "there is an obligation to timely comply with the orders of our trial courts[,]" and parties who violate such orders "do so at their own peril."  *Id*. at 1042-43.  *See also* **Banks v. Hill**, 978 So. 2d 663, 666 (Miss. 2008) ("[w]e find it would be inherently unfair and a violation of our rules of civil procedure for the plaintiff – who consistently has ignored the rules and violated the discovery deadlines – to appear at trial with experts whose opinions have not been properly disclosed to the defendants . . . .").  Under the circumstances presented, wherein Dr. Olson was tendered and accepted as an expert in neurology and testified as such, this Court cannot conclude that the circuit court abused its discretion in entering the "Order Granting in Part Defendants' Motion to Strike Plaintiff's Rebuttal Experts" and denying Dunn's "Motion for Reconsideration or, Alternatively, to Substitute."  Accordingly, this issue is without merit.

---

[21]Even if Dr. Malkin was a "rebuttal expert" (which this Court expressly concludes he was not), his designation on October 11, 2004, was six days after the October 5, 2004, deadline for designation of rebuttal experts enumerated in the "Case Management Order."

33

**IV.    Whether the circuit court abused its discretion in precluding Dunn from using the video deposition of neurologist Dr. Harry Gould.**

¶56.    Following the death of a designated expert witness, Dr. Yager filed a "Motion to Substitute Expert Witness" which was granted.[22]  Dr. Yager selected Dr. Harry Gould, a board-certified neurologist, as his substitute expert witness.  Dr. Yager then used Dr. Gould's deposition testimony in support of his "Second Motion for Partial Summary Judgment and Itemization of Undisputed Facts" and his "Opposition to Plaintiff's Second Motion for Partial Summary Judgment."  In August 2008, witness lists submitted by both Dr. Yager and Dunn included Dr. Gould (Dunn's list included him by deposition).

¶57.    On November 26, 2008, counsel for Dr. Yager sent a fax to counsel for Dunn stating, "[w]e do not plan on calling [Dr. Gould].  As you may know, under Mississippi law *this places certain restrictions on how you describe Dr. Gould to the jury*."  (Emphasis added.) Counsel for Dunn sent a responsive fax, which provided:

> [w]e are unaware of any Mississippi law that places restrictions on how we describe Dr. Gould to the jury.  Our position is that Dr. Gould was designated and retained as an expert on behalf of Dr. Yager.  He subsequently gave a deposition in his capacity as Dr. Yager's expert and to the extent that his deposition may be introduced at trial, *it is our intention to introduce it and refer to [Dr. Gould] as one of Dr. Yager's neurological experts*.  If you have some Mississippi law that is contrary to our position, please forward it to us . . . .  If we do not hear from you immediately, we will assume that you have no objection to us contacting Dr. Gould.

---

[22]The circuit court found that the death of an expert witness constituted "good cause" for substitution, as provided in the "Case Management Order."

(Emphasis added.)  Counsel for Dr. Yager then replied, by fax, that "[t]he case to which I point is *General Motors Corporation v. Jackson*, 636 So. 2d 310 (Miss. 1992).  We do object to your contacting Dr. Gould."

¶58.   After Dr. Yager was called as an adverse witness, Dunn asked the following questions:

> Q.  Isn't it true that *one of your experts* testified that the standard of care is exactly what I read?
>
> . . .
>
> Q.   Are you aware that *your own expert, Dr. Gould*, has testified that the standard of care requires the disclosure?
>
> . . .
>
> Q.  Didn't *the expert that you hired, Dr. Gould*, testify that the standard of care requires pretreatment of blood?

(Emphasis added.)  Following each question, Dr. Yager objected that this was "improper impeachment," and the circuit court sustained those objections.  Dunn subsequently proffered excerpts of Dr. Gould's deposition testimony "that would have been offered in impeachment of Dr. Yager."  During the cross-examination of Dr. Yager, counsel for Dunn approached the bench seeking to "ask Dr. Yager . . . about Dr. Gould and who he is, and if he reviewed his deposition. . . .  I know we have a collateral matter which I'm happy to stay away from, but I would like to get into what Dr. Gould says is the standard of care, since he's read that deposition."  According to counsel for Dunn, "I'm not going to mention who retained him . . . .  I just want to know that he read those opinions, and whether he agrees with them, since he's already testified about what the standard of care is . . . ."  The circuit judge stated that

35

"I haven't accepted Dr. Gould as an expert yet," and "I'm not going to allow the question."

Following the redirect examination of Dr. Yager, counsel for Dr. Yager moved to strike the use of Dr. Gould's deposition or trial testimony in Dunn's case-in-chief. According to counsel for Dr. Yager:

> Dr. Gould has now since been withdrawn as an expert. It is anticipated that [Dunn is] going to try to call Dr. Gould in [her] case in chief . . . and this situation is clearly governed by *General Motors* . . . .
>
> . . .
>
> This is the proverbial toothpaste out of the tube . . . . I don't think a curative instruction will suffice here. In fact, a curative instruction will probably highlight the fact . . . that Dr. Gould was retained on behalf of Dr. Yager . . . . *[H]ad the fact . . . not been brought before this jury that he was, in fact, a retained expert, I probably would have no problem with allowing him to testify in their case in chief, with the caveat that he not be mentioned as being our retained expert.*

(Emphasis added.) After noting that Dunn repeatedly referred to Dr. Gould as Dr. Yager's "own expert" when Dr. Yager was examined as an adverse witness, the circuit judge stated "the jurors, at least at the outset of this trial, were taking copious notes. Under the *General Motors* case, I find the testimony of Dr. Gould to be *highly prejudicial* to the defense and *will not allow it*." (Emphasis added.)

¶59. "The rules of discovery do not address whether the testimony of a nonwitness expert retained or dismissed by a party is admissible at trial. Admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Id*. at 314. *See also Deeds*, 27 So. 3d at 1141 (quoting *Smith v. State*, 986 So. 2d 290, 295 (Miss. 2008) (quoting *Jones v. State*, 918 So. 2d 1220, 1223 (Miss. 2005))) ("[f]urthermore, this Court will affirm the trial court's ruling '[u]nless we can safely say that

36

the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case . . . '").

¶60.    In *General Motors*, the plaintiffs ("Jacksons") were injured in an automobile accident and brought a products liability action against General Motors and its dealer ("Grenada Sales").  *See General Motors*, 636 So. 2d at 310-11.  During discovery:

> [t]he parties focused on developing expert opinions in support of their conflicting theories of axle failure: the Jacksons' assertion that the accident was caused by a stress fracture in the rear axle and General Motors' argument that the impact of the accident caused the axle to fracture.
>
> The pretrial battle of experts appeared to reach a crescendo in 1989, when John Marcosky, an expert in the field of accident reconstruction retained by the Jacksons, communicated to their attorneys that he believed the axle did not fracture prior to the accident.   The attorneys had responded through interrogatories that Marcosky was expected to testify that the crash was caused by a defective rear axle.  Much later in the discovery process, Marcosky presented an opinion similar to that espoused by General Motors' experts, adding that he believed the axle broke in mid-air during the rollover.  The attorneys filed supplemental responses withdrawing Marcosky as a potential expert . . . .

*Id*. at 312-13.  The circuit court, "[a]pplying a literal interpretation of [Mississippi Rule of Civil Procedure] 26(b)(4)(B),"[23] found that Marcosky "should not be allowed to testify in this cause."  *General Motors*, 636 So. 2d at 313-14.  This Court agreed that Marcosky "should

---

[23]Mississippi Rule of Civil Procedure 26(b)(4)(B) provides that:

> [a] party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Miss. R. Civ. P. 26(b)(4)(B).

not have been allowed to testify[,]" as "[n]either Grenada Sales nor General Motors presented a showing of exceptional circumstances making it impossible or impractical for them to obtain facts or opinions about the cause of the accident by any other means." *Id*. at 314.

¶61. But this Court added that "[o]ur discussion does not end with Rule 26(b)(4)(B)[,]" and also addressed "whether the testimony of a nonwitness expert retained or dismissed by a party is admissible at trial." *Id*. This Court acknowledged that "no privilege exists to bar Marcosky's testimony. Except in those instances where an expert was originally retained in another capacity, a majority of jurisdictions have held that the rules of privilege do not preclude calling an expert witness originally retained by the adverse party." *Id*. However, this Court further stated that:

> *[a]llowing General Motors to call Marcosky as a trial witness and to allude to the fact that he had been retained and later dismissed by the Jacksons would be highly prejudicial. Generally, when an expert formerly retained by a party is allowed to testify for an adverse party, he is restricted from mentioning the prior affiliation. [Granger v. Wisner, 134 Ariz. 377, 381, 656 P.2d 1238, 1242 (1982)].* The Arizona Court found:
>
>> [t]he admission of this evidence on direct examination would only serve to unfairly prejudice the plaintiff. Jurors unfamiliar with the role of counsel in adversary proceedings might well assume that plaintiff's counsel had suppressed evidence which he had an obligation to offer. Such a reaction would destroy counsel's credibility in the eyes of the jury.
>
> [*Id*. at 381-82], citing *State v. Biggers*, 360 S.W.2d 516, 517 (Tex. 1962). Without such safeguards, the resultant prejudice would impede the search for truth.

*General Motors*, 636 So. 2d at 315 (emphasis added). *See also* Miss. R. Evid. 403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice . . . .").  Additionally, this Court determined that "Marcosky's theory of the accident was nearly identical to that articulated by General Motors' own experts[,]. . . thus, [it] would have been cumulative." *General Motors*, 636 So. 2d at 314.  *See also* Miss. R. Evid. 403 ("[a]lthough relevant, evidence may be excluded . . . by considerations of . . . needless presentation of cumulative evidence.").  In sum, this Court concluded that the circuit court did not abuse its discretion in refusing to admit Marcosky's testimony.  *See General Motors*, 636 So. 2d at 314.

¶62.    Dunn argues that "[s]ince Dr. Yager failed to warn [her] about flu-like symptoms and severe dermatological adverse reactions, it was necessary to establish through competent expert testimony that these precautions were mandated by the standard of care owed by a neurologist."  According to Dunn, "Dr. Olson's tainted testimony could hardly be called cumulative when compared to that of Dr. Gould, who was board-certified in both neurology and pain management and a professor of medicine at LSU."

¶63.    Dr. Yager responds that:

> [t]he law in Mississippi is very clear as to experts that have been withdrawn as trial witnesses: the adverse party may call the witness but it may not be disclosed to the jury that the expert had the prior affiliation with the opposition. . . .  Disclosing this prior affiliation of Dr. Gould with Dr. Yager was "highly prejudicial" and in violation of Rule 403 . . . .  Dr. Yager does not dispute that [Dunn] could have called Dr. Gould as a witness.  However, when [Dunn's] counsel referred to Dr. Gould as Dr. Yager's retained expert, in various forms, three times during his examination of Dr. Yager, the guidelines of *General Motors* were violated.

*See id*. at 314-15.  Moreover, Dr. Yager maintains that because Dr. Olson was accepted as an expert in the field of neurology, testified after Dr. Yager, and "provided expert testimony on the standard of care required, Dr. Gould's testimony would have been cumulative."

39

¶64. *General Motors* clearly established that reference to an expert witness' "prior affiliation" with a party is "highly prejudicial." *General Motors*, 636 So. 2d at 315. On November 26, 2008, counsel for Dunn was placed on notice that Dr. Yager would not be calling Dr. Gould at trial and that *General Motors* "places certain restrictions on how you describe Dr. Gould to the jury." Nonetheless, counsel for Dunn opted to refer to Dr. Gould as Dr. Yager's expert on three separate occasions when examining him as an adverse witness. In light of these references, and the circuit judge's observation that the jurors had been "taking copious notes[,]" this Court cannot conclude that the circuit court abused its discretion in excluding Dr. Gould's deposition testimony as "highly prejudicial." While "the rules of privilege do not preclude calling an expert witness originally retained by the adverse party[,]" counsel for Dunn's prejudicial references to Dr. Gould as Dr. Yager's "own expert" and "the expert that you hired" supported exclusion. *Id*. at 314. Furthermore, Dunn's argument that Dr. Gould's testimony would not be cumulative, based upon his credentials relative to Dr. Olson, is misplaced. In short, only the opinions regarding the applicable standard of care are to be considered in the "cumulative" analysis. Expert qualifications are never cumulative and go only to the separate issue of the weight that the jury attributes to the opinions. Accordingly, this issue is without merit.

> **V.      Whether the circuit court erred in disclosing to the jury the fact that Dunn had settled with other defendants.**

¶65. Dunn filed a "Motion in Limine" seeking "to preclude any questions or comments regarding settlements. . . . Evidence regarding settlements is clearly inadmissible under Mississippi Rule of Evidence 408." In response, Dr. Yager contended that "[u]nder

40

Mississippi law, making a jury aware of the existence of a settlement is an acceptable procedure for determining damages in cases where some of the co-defendants have settled and are not present at trial." Following hearing, the "Order Denying Plaintiff's Motion in Limine Excluding Reference to Settlement" entered by the circuit court provided that "the jury will be informed of the existence of settlement, but . . . will be instructed not to consider any settlement in deciding the issue before it. The [c]ourt also finds no reference to the amount of any settlement will be made by any party." At trial, the circuit court instructed the jury that:

> [t]here were a number of defendants. Some of those defendants have had their case concluded against them, some have settled, and you'll hear that from the lawyers. The settlement amounts, and how some of these cases have been resolved, are not your concern. You're here as a jury to give [Dunn] and [Dr. Yager] a fair trial. And you need to listen to the facts about Dr. Yager and [Dunn], and not be concerned about these other individuals.

¶66. This Court reviews questions of law de novo. *See **Narkeeta Timber Co., Inc. v. Jenkins***, 777 So. 2d 39, 41 (Miss. 2000). *See also **Smith v. Payne***, 839 So. 2d 482, 487 (Miss. 2002) ("[t]he trial judge did not *err* by allowing the jury to be informed of the settlement agreement") (emphasis added). Mississippi Rule of Evidence 408 provides, in pertinent part, that "[e]vidence of . . . (2) accepting . . . a valuable consideration in compromising . . . a claim which was disputed as to either validity or amount, is *not admissible to prove liability for or invalidity of the claim or its amount*." Miss. R. Evid. 408 (emphasis added). Moreover, this Court has stated that "[t]o inform a jury of the amount of a settlement prior to its returning a verdict for a joint tortfeasor or co-defendant would certainly unnecessarily influence a jury in its decision." ***Whittley v. City of Meridian***, 530

41

So. 2d 1341, 1346 (Miss. 1988). But this problem is "easily . . . prevented by use of the procedure wherein the jury is informed of the *existence of a settlement but not the amount of settlement . . . .*" **Id**. (emphasis added). *See also* **Smith**, 839 So. 2d at 489 ("[o]n retrial, the jury may be informed of existence of the settlement . . . , but it should not be told the amount of the settlement"). As that procedure is precisely what the circuit court performed in this case, this Court concludes there was no error. Accordingly, this issue is without merit.

## VI.    Whether the circuit court's jury instructions regarding "informed consent" were erroneous.

¶67.    An SJS reaction is extremely rare. *See* footnote 5, *supra*. Moreover, Dr. Yager testified that only twenty-five percent of SJS cases are "drug related."[24] Additionally, multiple experts testified that the drugs associated with SJS are myriad.[25]

¶68.    Dunn testified that, had Dr. Yager informed her of potentially life-threatening blood, skin, or liver disorders which could result from taking Tegretol, "I believe I would have told him, no, that I did not want to take that drug; was there something else he could prescribe that wasn't as dangerous." By contrast, Dr. Yager testified that his conversation with Dunn in prescribing Tegretol met the applicable standard of care. As noted in ¶¶ 7, 12, *supra*, Dr. Yager testified that "I believe I told her some typical side effects of the medication she could

[24]Dr. Yager added that another twenty-five percent of SJS cases are "virally related" and all other SJS cases are "not associated with any particular medication." As Dr. Millette testified, "[i]t's important for the jury to also know that you can get [SJS] for no known cause. You don't have to have a drug exposure."

[25]Prescription drugs taken by Dunn between 1993 and 1995 with a known association with SJS at the time included Phenobarbital and Rocephin. After 1995, known associations with SJS were also found in Ultram and Medrol Dosepak. Among other prescription drugs with known associations with SJS are Lipitor, Neurontin, Amoxil, Tagamet, and Wellbutrin.

42

have, and I did tell her if anything untoward happened that she didn't understand, she should get in touch with our office . . . ."

¶69. Dr. Olson testified that Dr. Yager categorically had breached the requisite standard of care if he had failed to provide Dunn with information on the potentially life-threatening blood, skin, or liver disorders, including SJS, which could result from taking Tegretol. But another of Dunn's experts, Dr. McLeod, stated that "[n]o physician talks about every adverse event, nor adverse side effect that can be expected, because first of all, it would be impossible to talk about some of them, because different patients experience different things." Dr. McLeod specifically did *not* testify that failing to inform a patient of the risk of SJS would constitute a breach of the applicable standard of care. Dr. Merlin Robert Wilson, tendered by Dr. Yager and accepted as an expert in the fields of internal medicine, rheumatology, immunology, and allergy, testified that Dr. Yager's disclosure to Dunn regarding Tegretol was within the applicable standard of care, as "[y]ou're going to give them the most common side effects, then you're going to give them some warning signals." Dr. Wilson stated that he would not mention SJS, but only an "allergic reaction," because "[y]ou would describe it in the terms [the patient] can understand." According to Dr. Wilson, he also would never "get the PDR to read to the patient[,]" and he had never before focused upon the "Information to Patients" section therein. Likewise, Dr. Millette did not rely upon the PDR's "Information to Patients" section. Dr. Millette testified that Dr. Yager's disclosure to Dunn regarding Tegretol is "what I do[,]" and was "[a]bsolutely" within the standard of care for a neurologist prescribing Tegretol in 1995 for neuropathic pain. According to Dr. Millette, "as long as you share the information, you share what the most likely risks are, and explain

43

why you're using this drug and what your expectations are.  That's informed consent.  And

*what transpired here is what we do every day.   It's absolutely middle of the road*."

(Emphasis added.)  Dr. Millette specifically noted that:

> I think that what should be included for proper informed consent, and what we all do is tell the patient . . . this is a seizure drug, but we're not obviously treating seizures.  It's found to be very effective for nerve pain.  That the most common side effects are dizziness, sedation, blurred vision. . . .  And you usually, . . . but I don't do this every time, you say you may have a rash, but if you have a problem, let me know, and proceed from there.  But . . . most of the time I don't say on or off-label. . . .  But that's what you would need to say to the patient if it's standard of care.  *You have to discuss the most common side effects, not getting struck by lightning.*

(Emphasis added.)

¶70.    At trial, Jury Instruction P-8A provided, in pertinent part, that:

> [t]o obtain the required informed consent, the physician must inform the patient of all the material known risks associated with the suggested treatment.  The purpose of disclosing the material risks of the suggested treatment is to enable the patient, such as [Dunn], to make an intelligent and informed decision about whether to undergo the suggested treatment, in this case, taking Tegretol to alleviate back and leg pain.  Dr. Yager is negligent if you find by a preponderance of the evidence: (1) Dr. Yager failed to inform [Dunn] of all the material known risks of taking Tegretol to alleviate back and leg pain and (2) a reasonable patient would not have taken Tegretol to alleviate back and leg pain had she or he been properly informed of the material known risks of Tegretol.
>
> A known risk is material if the known risk would be important to a reasonable person in [Dunn's] position in deciding whether or not to undergo the treatment . . . .
>
> . . .
>
> For Dr. Yager's negligence for failing to obtain informed consent to have proximately caused or contributed to the injuries sustained by [Dunn], you must find that [Dunn's] injuries were more likely than not caused by Tegretol.

44

Jury Instruction D-10, given over Dunn's objection that it "is a grossly understated statement

of the law on material risks[,]" stated:

> [i]f you find from the evidence that Dr. Yager, prior to prescribing Tegretol, in his discussions with [Dunn], reasonably advised [Dunn] of the risks of taking Tegretol as prescribed which would have been material to a prudent patient in determining whether or not to undergo this particular treatment, then in that event, [Dunn] has failed to prove that Dr. Yager was negligent by failing to obtain [Dunn's] informed consent . . . .

Jury Instruction D-30, given over Dunn's objection, provided, in pertinent part, that:

> from among all possible risks of a medical treatment, only those which are material must be disclosed in order to obtain informed consent to the treatment. [Dunn] must establish by expert medical testimony that the particular risk in question in this matter is material showing that the risk is one which a reasonable medical practitioner of like training to Dr. Yager would disclose under the same or similar circumstances.
>
> [Dunn] must prove, by a preponderance of the evidence, that:
>
> . . .
>
> > 4. A minimally competent physician practicing in the same field of practice or specialty as Dr. Yager would have warned [Dunn] of the risk of contracting [SJS]; and
> > 5. A reasonably prudent patient, fully advised of the material known risks, would have withheld consent had she been properly informed of the risks, alternatives, and so forth; and
> > 6. The unauthorized treatment was the proximate cause of [Dunn's] injury, that is, [Dunn] must show that she would not have been injured had the appropriate standard of care been exercised.

¶71.   This Court has stated that:

> [r]egarding jury instructions, the trial court possesses *considerable discretion*.
>
> . . .
>
> On appellate review of the trial court's grant or denial of a proposed jury instruction, our primary concern is that "the jury was fairly instructed and that

45

each party's proof-grounded theory of the case was placed before it." [*Splain v. Hines*, 609 So. 2d 1234, 1239 (Miss. 1992)] (citing *Rester v. Lott*, 566 So. 2d 1266, 1269 (Miss. 1990)). *We ask whether the instruction at issue contained a correct statement of law and was warranted by the evidence. . . .* In analyzing the aggregate jury instructions, "*[d]efects in specific instructions will not mandate reversal when all of the instructions, taken as a whole fairly – although not perfectly – announce the applicable primary rules of law.*" [*Beverly Enters. v. Reed*, 961 So. 2d 40, 43 (Miss. 2007)] (citing *Burton v. Barnett*, 615 So. 2d 580, 583 (Miss. 1993)).

*Young v. Guild*, 7 So. 3d 251, 259-60 (Miss. 2009) (emphasis added).

¶72.    "Informed consent originates from the theory that a competent adult has the right to control his body and to make an informed decision as to whether to authorize a medical procedure." *Jamison v. Kilgore*, 903 So. 2d 45, 49 (Miss. 2005) (quoting *Jamison v. Kilgore*, 905 So. 2d 610, 612 (Miss. Ct. App. 2004)). But:

> [e]very medical procedure involves risks. . . . [N]o court has ever required a physician to disclose to a patient every possible risk of a medical procedure. Instead, from among all possible risks of a procedure, only those which are material must be disclosed in order to obtain informed consent to the procedure. This begs the question: [w]hat must be done (in the legal sense) to establish what are – and are not – the material risks of a particular procedure?

*Whittington v. Mason*, 905 So. 2d 1261, 1264 (Miss. 2005).

¶73.    "The doctrine of informed consent represents the application to medical practice of principles of tort law. Thus, when a lack of informed consent is claimed, the plaintiff has the burden to prove by a preponderance each element of the prima facie case: duty, breach of duty, proximate causation, and injury." *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1363 (Miss. 1990). Regarding duty, this Court has stated that "[w]hen a physician-patient relationship exists, the physician owes the patient a duty to *inform* and *obtain* consent with regard to the proposed treatment." *Id*. (emphasis in original). But "no doctor could

46

comply with a requirement to disclose every possible risk to every procedure." ***Whittington***,

905 So. 2d at 1266. Therefore, the physician must disclose only "*material known risks.*"

***Jamison***, 903 So. 2d at 48-49 (quoting ***Reikes v. Martin***, 471 So. 2d 385, 392 (Miss. 1985))

(emphasis added). A "known risk" is one "which would be known to a careful, skillful,

diligent and prudent practitioner or specialist . . . ." ***Jamison***, 903 So. 2d at 49 (quoting

***Reikes***, 471 So. 2d at 392 n.3). "Once the known risks are enumerated, they can then be

evaluated as to which are material." ***Jamison***, 903 So. 2d at 50. "[T]he physician may not

be required to inform the patient of unexpected or immaterial risks."[26] ***Palmer***, 564 So. 2d

at 1364. "Among the many factors which could weigh on the question of materiality are

frequency of occurrence, potential severity or danger associated with the risk, and the cost

and availability of an alternative procedure. These factors cannot be established absent

expert testimony." ***Whittington***, 905 So. 2d at 1266. "*If* a known risk is found to be

*material*," and was not disclosed to the patient, then "*the question of causation must . . . be

addressed.*" ***Jamison***, 903 So. 2d at 50 (emphasis added).

¶74.    Regarding causation, this Court has held that there are two subelements:

> [f]irst, the plaintiff must show that a reasonable patient would have withheld
> consent had she been properly informed of the risks, alternatives, and so
> forth.[27] . . . And second, the plaintiff must show that the treatment was the

---

[26]As an example of an "immaterial risk," ***Palmer*** cited a case involving a 1-in-100,000 risk. *See* ***Palmer***, 564 So. 2d at 1364 n.21 (citing ***Henderson v. Milobsky***, 595 F.2d 654 (D.C. Cir. 1978)). *See also* ***Feeley v. Baer***, 679 N.E.2d 180, 181 (Mass. 1997) (citation omitted) ("[r]egardless of the severity of a potential injury, if the probability that the injury will occur is so small as to be practically nonexistent, then the possibility of that injury occurring cannot be considered a material factor . . . ").

[27]This is an "objective test" centered upon "whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested

proximate cause of the worsened condition (i.e., injury). That is, the plaintiff must show that she would not have been injured had the appropriate standard of care been exercised. Generally, proof of the latter sub-element requires expert testimony that the defendant's conduct – not the patient's original illness or injury – led to the worsened condition.

*Palmer*, 564 So. 2d at 1364 (internal citation omitted).

¶75. According to Dunn, Instruction P-8A "accurately reflects Mississippi's law on informed consent[,]" but is in "direc[t] conflict" with Instructions D-10 and D-30. Dunn maintains that Instructions D-10 and D-30 "incorrectly instruct the jury that in order to obtain [Dunn's] informed consent, a doctor does not have to disclose all of the material risks associated with prescribing Tegretol, only those risks which are routinely disclosed by doctors of similar training under the same or similar circumstances[,]" and "improperly suggested to the jury that [SJS] was the only potential material risk upon which [Dunn] could have declined treatment with Tegretol for her back and leg pain."[28] Dunn argues further that Instructions D-8A, D-14, D-18, D-27, and D-33 "prematurely absolve Dr. Yager from informed consent liability in the event no negligence is found" by "improperly instruct[ing] the jury that [upon] a finding that Dr. Yager's actions met the standard of care for a 'similarly trained' doctor that he was absolved of all liability, including informed consent, which does not depend on the applicable standard of care, but rather disclosure of all material risks."[29]

---

treatment." *Jamison*, 903 So. 2d at 48-49 (quoting *Reikes*, 471 So. 2d at 392).

[28]According to Dunn, "[t]here is no requirement that the 'injury' be one of the material risks."

[29]For example, Jury Instruction D-18 provided that:

[i]f you are reasonably satisfied . . . that Dr. Yager complied with the standard set by the learning, skill and care ordinarily possessed and practiced at the

48

¶76. Dr. Yager responds that "the instructions, when read as a whole, provided the jury the appropriate law and how to apply it." According to Dr. Yager, "[t]he jury . . . had the task of determining if [SJS] was a material risk of Tegretol. They determined it was not." As to other potential material risks, Dr. Yager asserts that Dunn "fails to cite a single case that addresses material risks as being those irrelevant to the proceedings[,] . . . [t]he alleged faulty warning and/or failure to obtain informed consent must be related to the injury that instigated the lawsuit."

¶77. Regarding informed consent, "material known risks" must be disclosed. *Jamison*, 903 So. 2d at 48-49 (quoting *Reikes*, 471 So. 2d at 392). A "known" risk is one that is "known to a careful, skillful, diligent and prudent practitioner . . . ." *Jamison*, 903 So. 2d at 49 (quoting *Reikes*, 471 So. 2d at 392 n.3). "[M]ateriality" must be established by expert testimony. *Whittington*, 905 So. 2d at 1266. Only after it is established that the risk at issue is a "material known risk" does the analysis proceed to the causation inquiry of whether "a reasonable patient would have withheld consent had she been properly informed . . . ." *Palmer*, 564 So. 2d at 1364. *See also Jamison*, 903 So. 2d at 50. As to causation, the plaintiff must further establish that "the treatment was the proximate cause of the worsened condition (i.e., injury)." *Palmer*, 564 So. 2d at 1364. Under the aforementioned standards, this Court finds that Jury Instructions D-10 and D-30, viewed within the context of the jury instructions as a whole, properly state the law on informed consent. *See Young*, 7 So. 3d at

time in question by other physicians in the same general line of practice, in the national medical community under the same or similar circumstances, as shown by the expert medical evidence in this case, then you must return a verdict for Dr. Yager.

49

259-60. Jury Instruction D-30 provides that Dunn must prove materiality of the risk through expert testimony establishing that "the risk is one which a reasonable medical practitioner of like training to Dr. Yager would disclose under the same or similar circumstances."[30] Jury Instruction D-10 further states that the risk must be "material to a prudent patient in determining whether or not to undergo this particular treatment . . . ." Jury Instruction D-30 then addresses causation, providing that the "reasonably prudent patient, fully advised of the material known risks, would have withheld consent . . . ." Jury Instruction P-8A adds that the causation inquiry also must include a finding that Dunn's injuries "were more likely than not caused by Tegretol."[31] Given the deferential standard of review, and considering the jury instructions as a whole, this Court concludes that the circuit court did not err in granting the disputed jury instructions. *See id*. Accordingly, this issue is without merit.

VII. **Whether the circuit court abused its discretion in precluding Dunn from introducing excerpts from the 2009 Physician's Desk Reference.**

¶78. At trial, Dunn sought to introduce an excerpt from the 2009 PDR regarding carbamezapine.[32] Specifically, the "black-box warning" had been expanded to provide that "[s]erious and sometimes fatal dermatological reactions, including Toxic Epidermal

---

[30]Because the "known" and "material" legal standards tie in to that which would be disclosed by a "reasonably prudent, minimally competent" neurologist "under the same or similar circumstances[,]" this Court finds that Dunn's argument regarding Jury Instructions D-8A, D-14, D-18, D-27, and D-33 is without merit.

[31]As there is no dispute that Dunn did not contract aplastic anemia or agranulocytosis, extremely rare blood conditions even for a patient taking Tegretol, this Court is dubious as to whether the disclosure, *vel non*, of such conditions is relevant in a case involving the unrelated condition of SJS.

[32]This is the chemical name for the drug whose marketing name is Tegretol.

Necrolysis and [SJS], have been reported during treatment with Carbamezapine. . . . These reactions are estimated to occur in 1 to 6 per 10,000 new users in countries with mainly Caucasian populations." Dr. Yager responded that the 2009 PDR was inadmissible as "we're talking about Tegretol and its association with [SJS] in . . . '95." The circuit court agreed with Dr. Yager, stating that "it's real simple. It's called ex post facto. . . . And right now I don't find it to be relevant to Dr. Yager at all. It's as if 10, 20 years later, look what's happened . . . ." Following Dunn's proffer of the 2009 PDR excerpt, the circuit court added that its ruling was also premised upon the introduction of the testimony of Dunn's expert, Dr. Waring. *See* footnote 5, *supra*.

¶79. This Court:

> "reviews the trial court's decision to admit or exclude evidence under an abuse of discretion standard of review." [*Smith*, 986 So. 2d at 295]. Furthermore, this Court will affirm the trial court's ruling "'[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case.'" *Id*. (quoting [*Jones*, 918 So. 2d at 1223]).

*Deeds*, 27 So. 3d at 1140-41. The issue presented at trial was the sufficiency of Dr. Yager's disclosure in 1995. The expanded "black-box warning" fourteen years later, in 2009, has no relevance to that issue. As the circuit judge stated, it is "ex post facto" and risked confusing the jury. Therefore, this Court concludes that the circuit court did not abuse its discretion in overruling Dunn's attempted admission of excerpts from the 2009 PDR. Accordingly, this issue is without merit.

## CONCLUSION

¶80.    Regarding Dr. Yager's cross-appeal, this Court affirms the Circuit Court of Jackson County's exercise of personal jurisdiction over Dr. Yager.  As to the issues raised by Dunn on direct appeal, this Court affirms the final judgment in favor of Dr. Yager and the circuit court's denial of Dunn's "Motion for Judgment Notwithstanding the Verdict, Relief from Judgment and New Trial."

¶81.    **ON DIRECT APPEAL:   AFFIRMED.**

**ON CROSS-APPEAL:    AFFIRMED.**

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**