**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CT-00700-SCT**

*BENNIE SCOTT WHITTINGTON AND TINA S.*
*WHITTINGTON*

**v.**

*WOODIE L. MASON, M.D. AND HINDS UROLOGY*
*CLINIC, P.A.*

<u>**ON WRIT OF CERTIORARI**</u>

DATE OF JUDGMENT:                       12/03/2002
TRIAL JUDGE:                            HON. W. SWAN YERGER
COURT FROM WHICH APPEALED:             HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:               DOUGLAS G. MERCIER
                                       WILLIE T. ABSTON
ATTORNEYS FOR APPELLEES:               GEORGE QUINN EVANS
                                       LYNDA CLOWER CARTER
NATURE OF THE CASE:                    CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                           AFFIRMED - 06/16/2005
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     The narrow question presented in this medical negligence case is whether expert

testimony is required to establish the material risks which must be disclosed to a patient in

order to obtain informed consent to a medical procedure.

**BACKGROUND**

¶2.     Because the trial court directed a verdict for the defendants, we begin by setting forth

the facts in the light most favorable to the plaintiffs.   After fathering six children, Bennie Scott

Whittington considered having a vasectomy. He and his wife, Tina, visited Dr. Woodie L. Mason at the Hinds Urology Clinic, P.A. (the "Clinic"), on May 19, 1998, to discuss the procedure. A nursing assistant directed the Whittingtons to a room where they watched an informational videotape about the vasectomy procedure. After watching the videotape, the Whittingtons met with Dr. Mason to discuss the procedure. At some point prior to leaving the clinic, the Whittingtons were presented with a consent form for the procedure which disclosed certain risks. The Whittingtons signed the consent form just below the following language printed on the form: "we have been informed of alternatives and complications."

¶3. Mr. Whittington returned on May 29, 1998, for the vasectomy, which Dr. Mason performed as an out-patient procedure. Following the procedure, Mr. Whittington returned home. Within a few hours, he began to experience severe pain and swelling in his scrotal area. Mrs. Whittington called Dr. Mason who instructed Mr. Whittington to return to the clinic. Dr. Mason advised Mr. Whittington to stay off his feet for the remainder of the day, but advised him that the pain should resolve within a few hours, and he should be able to return to work within 72 hours.

¶4. Mr. Whittington continued to experience severe pain, bruising and swelling. He returned to see Dr. Mason on June 2 and again on June 8. During the latter visit, Dr. Mason released Mr. Whittington to return to work. The next day at work, Mr. Whittington and another worker were lifting a tire from an "18 wheeler" when Mr. Whittington experienced an episode of extreme pain on the right side of his scrotum. He was also bleeding in the scrotal area. He called Dr. Mason who instructed him to return to the clinic the next day.

¶5.    Dr. Mason applied silver nitrate to the scrotal area and then informed Mr. Whittington that he required a second surgery to remove a granuloma that had developed following the vasectomy.

¶6.    After Dr. Mason removed the granuloma on July 15, Mr. Whittington continued to experience pain, severe swelling and bruising for six to eight weeks. An open, draining hole remained at the surgical site, and he was unable to return to work for several weeks.

¶7.    When Dr. Mason saw Mr. Whittington again on July 24, he advised that the pain should subside. On August 3, Dr. Mason released Mr. Whittington to return to work. However, because he still experienced pain, Mr. Whittington decided to seek a second opinion.

¶8.    Sometime around the middle of August, Mr. Whittington scheduled an appointment with Dr. Bruce Shingleton, who recommended another surgery to remove a granuloma. The procedure was performed at the end of August. Mr. Whittington continued to experience pain and severe swelling for several weeks. He remained under Dr. Shingleton's care for several months because the pain continued.

¶9.    On November 30, Dr. Shingleton released Mr. Whittington. However, because he still suffered abdominal cramps and pain following sexual activity, Mr. Whittington decided to get a third opinion.

¶10.    On January 29, 1999, Mr. Whittington saw Dr. Lionel Fraser who prescribed a course of pain therapy and treatment which included a scrotal injection to alleviate the pain. When these measures did not end the pain, Dr. Fraser removed Mr. Whittington's right testicle, and approximately one week later the pain subsided.

¶11. The Whittingtons filed suit against Dr. Mason and the Clinic, alleging various causes of action. However, an Agreed Order of Partial Summary Judgment was entered, leaving as the only relevant issue before the trial court the question of whether Dr. Mason obtained informed consent to perform the vasectomy.

¶12. At trial, the Whittingtons did not call an expert to establish the material risks which should have been disclosed in order to obtain informed consent. After the jury failed to reach a verdict, the trial court directed a verdict for the defendants. The Whittingtons timely filed an appeal which was assigned to the Court of Appeals.

¶13. In affirming the trial court's directed verdict for the defendants, the Court of Appeals stated that "[e]xpert testimony is necessary to determine whether or not the loss of a testicle is a known risk in a procedure such as a vasectomy." 2004 WL 2163388 at *3 (Miss. Ct. App. 2004). Because the Whittingtons presented no expert testimony, the Court of Appeals concluded that the defendants could not be held liable for failure to disclose the loss of a testicle as a risk of the procedure. The Court of Appeals provided no further analysis of the Whittingtons' claim that Dr. Mason failed to adequately inform them of other risks of the vasectomy including severe, chronic pain and bruising, sperm granuloma, and additional medical procedures.

¶14. In a motion for rehearing, the Whittingtons directed the Court of Appeals to Dr. Mason's own testimony in which he admitted the existence of multiple "known risks" of a vasectomy. In their brief, the Whittingtons state:

> Mr. Whittington suffered an orchiectomy, and the decision of the Court of Appeals holds that there was no expert testimony at trial to establish that the "orchiectomy" was a "known risk" of Dr. Mason's vasectomy. But accepting the

4

holding of the Court of Appeals, according to the transcript of the trial testimony, the same holding cannot be applied to the other "known risks" to which Dr. Mason testified while being cross-examined in the Plaintiffs' case-in-chief at the trial of this civil action. Those other "known risks" of chronic pain, sperm granuloma and additional surgical procedures represent painful and compensable complications which were suffered by Scott Whittington as a result of Dr. Mason's vasectomy procedure, and those other post-vasectomy complications are matters on which Scott Whittington presented evidence at trial.

¶15. We granted the Whittingtons' petition for writ of certiorari and now proceed to finally decide the matter.

## ANALYSIS

¶16. Every medical procedure involves risks. As discussed infra, no court has ever required a physician to disclose to a patient every possible risk of a medical procedure. Instead, from among all possible risks of a procedure, only those which are material must be disclosed in order to obtain informed consent to the procedure. This begs the question: What must be done (in the legal sense) to establish what are – and are not – the material risks of a particular procedure?

¶17. It is apparent from the excellent briefs submitted by both parties that our jurisprudence regarding "informed consent" is not crystal clear on this point. We shall therefore review in some detail the prior decisions of this Court which discuss the requirements for informed consent.

*Professional community standard*

¶18. Prior to 1985, Mississippi followed the "professional community" standard for a determination of the material risks which must be disclosed in order to obtain conformed consent. This professional community standard, in turn, required medical experts to establish

5

the acceptable standard within the medical community. For instance, in ***Ross v. Hodges***, 234 So. 2d 905 (Miss. 1970), a patient charged her physician with failure to disclose the risk of neurological deficit associated with cranial surgery. In affirming the trial court's directed verdict on the issue of informed consent, this Court held, "Plaintiff had the burden of proving, in this respect, the professional standard according to the customs of medical practice of neurosurgeons in this area."[1] ***Id***. at 909.

*Reikes v. Martin*

¶19. In 1985, this Court decided ***Reikes v. Martin***, 471 So.2d 385 (Miss. 1985), wherein the plaintiff claimed inter alia, that her doctors failed to obtain her informed consent to cobalt therapy for uterine cancer. In their appeal of a jury verdict of $543,750, the doctors assigned as error the granting of a jury instruction which provided that "the defendants could be found liable for failing to fully inform [the plaintiff] of the risk of cobalt therapy, where no evidence in the record showed she would have elected not to undergo the therapy had she been so informed." ***Id***. at 391. In briefly discussing a physician's duty to inform a patient of risks, the ***Reikes*** Court recognized and cited the authority of ***Ross v. Hodges***. It is important to note at this juncture that, as to the test for material risks, the ***Reikes*** Court neither questioned nor overruled ***Ross v. Hodges***.

---

[1]In ***Hall v. Hilbun***, 466 So. 2d 856, 874-75 (Miss. 1985), the requirement that medical experts base their opinions on local standards of care was changed to allow testimony based upon the standard of care of "minimally knowledgeable and competent physicians in the same specialty or general field of practice. . . ." This change, however, has no bearing on the case before us today.

¶20.    As to the issue of causation (which was the only "informed consent" issue raised on appeal and discussed in *Reikes*), this Court began by setting forth the jury instruction at issue, which stated:

> The court instructs the jury that a physician must obtain consent from a patient to perform the procedure or treatment performed on the patient.  To obtain the required consent, the physician must explain the procedure to the patient and warn the patient of all material risks or dangers in the procedure or treatment.  The purpose of the explanation is to enable the patient such as [the plaintiff] to make an intelligent and informed choice about whether to undergo the treatment or procedure, in this case, cobalt therapy.  The physician is negligent if he fails to disclose to the patient . . . all material information, risks and warnings.
>
> A risk or danger is material if it would be important to a reasonable person in the patient's position in making the decision whether or not to undergo the procedure or treatment, in this case, cobalt therapy.
>
> The physician is not required to disclose all possible information.  The physician need only disclose information for a reasonable person to make an intelligent decision.

*Reikes,* 471 So. 2d at 392.  Commenting on the instruction, the *Reikes* Court then stated:

> Although not referred to by name, *this instruction applied*[2] the so-called prudent patient or materiality of the risk standard in determining what risks must be revealed to the patient.  Under this standard, a physician must disclose those known risks which would be material to a prudent patient in determining whether or not to undergo the suggested treatment.
>
> The appellants contend that the above jury instruction was erroneous as it allowed recovery upon proof that informed consent was not given and without any showing of causation, *i.e.*, that Mrs. Martin would not have elected to undergo the treatment if she had been informed of the known risks.

*Id.*  The *Reikes* Court then addressed the causation issue:

> To recover under the doctrine of informed consent, as in all negligence cases, there must be a causal connection between the breach of duty by the

---

[2]Although the <u>instruction</u> applied the "prudent patient or materiality of the risk standard" for the determination of which risks must be disclosed, the *Reikes* Court neither approved nor adopted the standard.

7

defendant and the injuries suffered by the plaintiff. Some states have adopted a subjective standard, requiring the plaintiff to testify or otherwise prove that she would not have consented to the proposed treatment if she had been fully informed. [citations omitted]. A second test, and the one used by the vast majority of the states, is based upon an objective standard. Under this test, the question becomes whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment.

*Id.* The *Reikes* Court then stated: "[W]e think an objective test is the more desirable and adopt that test as the one to be applied in this State." *Id.* at 393. Critical to an understanding of the holding in *Reikes* is that the Court adopted the objective test for *causation*, but did not make any finding with respect to the duty to disclose.

¶21. Nevertheless, the *Reikes* decision would be credited in later cases with adopting the objective patient-need standard for determining the materiality of a risk. *See*, e.g., *Herrington v. Spell*, 692 So. 2d 93, 98 (Miss. 1997) ("We have adopted [in *Reikes*] an objective test to determine what information a physician must disclose. . . ."); *Hudson v. Parvin*, 582 So. 2d 403, 410 (Miss. 1991) ("We have adopted an objective test [in *Reikes*] to determine what information a physician must disclose. . . ."); *Phillips ex rel. Phillips v. Hull*, 516 So. 2d 488, 493 (Miss. 1987) ("However, recently the Court [in *Reikes*] recognized the objective patient-need standard. . . .").

¶22. Thus, the perceived change from the "professional community" standard to the "objective patient need" standard for determining material risks, springs from a misapplication of *Reikes*. It bears repeating that the adoption by the *Reikes* Court of the objective standard *for purposes of determining causation* is unrelated to the obligation of the plaintiff to

8

produce expert testimony to establish the material risks of a medical procedure which should be disclosed.

¶23. The use of the objective (as opposed to subjective) standard for establishing causation, as announced in *Reikes*, is not before us.

¶24. As recognized by the *Reikes* Court, no doctor could comply with a requirement to disclose every possible risk to every procedure. 471 So. 2d at 392. Doctors must, however, disclose material risks associated with a particular procedure. Among the many factors which could weigh on the question of materiality are frequency of occurrence, potential severity or danger associated with the risk, and the cost and availability of an alternative procedure. These factors cannot be established absent expert testimony.

*This Court's holding*

¶25. Thus, we hold today that expert testimony is required to assist the finder of fact in determining whether a particular risk is material, requiring disclosure to the patient prior to a medical procedure. In the event of conflicting expert testimony, the finder of fact must evaluate the basis for each expert opinion and decide which is more credible. This determination is no different from other issues requiring expert testimony.

¶26. The record in the case sub judice indicates that there were several "risks" of the vasectomy which the Whittingtons claim were not disclosed. However, the Whittingtons produced no expert testimony to establish that these risks were material and should have been disclosed. Thus, the Whittingtons' claim of lack of informed consent must fail.

¶27. Our review of the record in this case leads us to the conclusion that the jury had no reasonable basis to determine that material risks of a vasectomy included any of the undesired

results of the procedure which the Whittingtons claim were not disclosed. Any such determination by the jury would have been pure speculation.

## CONCLUSION

¶28. We hold that a plaintiff must produce expert testimony to establish the material risks and available alternatives of a medical procedure. Absent such expert testimony, a jury may not consider whether a physician conducted a medical procedure without informed consent. To the extent this Court's prior cases – including the cases cited herein – conflict with our decision today, they are hereby overruled. Because the Whittingtons produced no expert testimony to assist the jury in determining which complications of the vasectomy were material risks requiring disclosure or further explanation prior to the procedure, we affirm the trial court's grant of judgment in favor of the defendants and the judgment of the Court of Appeals.

¶29. **AFFIRMED**.

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**