# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00334-COA

**LACY DODD AND CHARLES DODD**  APPELLANTS

v.

**DR. RANDALL HINES, MISSISSIPPI**  APPELLEES
**REPRODUCTIVE MEDICINE, PLLC AND DR.**
**PAUL SEAGO**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/2015 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. KEITH PEARSON |
| | SARAH LYNN DICKEY |
| ATTORNEYS FOR APPELLEES: | WHITMAN B. JOHNSON III |
| | JOHN BURLEY HOWELL III |
| | MICHAEL F. MYERS |
| | BENJAMIN COLLIER LEWIS |
| | WALTER T. JOHNSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | SUMMARY JUDGMENT FOR DEFENDANTS |
| DISPOSITION: | REVERSED AND REMANDED - 09/06/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1. This is an appeal from the Rankin County Circuit Court's grant of summary judgment in favor of Dr. Randall Hines (Hines), Reproductive Medicine PLLC (RM), and Dr. Paul Seago (Seago), on the basis that Hines, RM, and Seago had Lacy Dodd's (Lacy) consent to remove both of her ovaries. The circuit court's grant of summary judgment was based on a document signed by Lacy authorizing the removal of ovarian cyst(s), possible removal of one

fallopian tube, and other procedures considered "necessary or emergent" to the medical staff. We reverse and remand for further proceedings consistent with this opinion.

## PROCEDURAL NOTE

¶2. On May 17, 2013, Lacy and Charles Dodd (Charles), Lacy's husband, filed a complaint in Rankin County Circuit Court. Shortly after, the defendants filed an answer and quickly moved for summary judgment before discovery was conducted. Numerous exhibits were submitted in support in the form of affidavits, medical records, lab results, and more. Our discussion is limited to the filings before the circuit court filed in support or response to the motion for summary judgment.

## FACTUAL BACKGROUND

¶3. In 2011 Lacy was concerned over fertility issues. She consulted Hines, an obstetrician and gynecologist specializing in infertility.[1] On March 25, 2011, in order to increase her chances of conception, Lacy authorized Hines to remove an ovarian cyst or cysts (ovarian cystectomy) and possibly remove one of her fallopian tubes (salpingectomy). Prior to the procedure, Lacy signed a document that provided in part:

> I further consent and authorize the performance of such additional surgeries and procedures (whether or not arising from presently unforeseen conditions) considered necessary or emergent in the judgment of my doctor or those of the hospital's medical staff who serve me.

¶4. Hines's affidavit states that, after commencing surgery, he observed that both of

---

[1] At the time of Lacy's initial visit, she was twenty-seven years old.

Lacy's ovaries lacked any normal tissue and appeared clinically cancerous. Hines stated that he consulted intraoperatively with Seago, an obstetrician and gynecologist specializing in gynecological cancers. Both doctors' affidavits stated that they agreed that "the ovaries were clearly not going to be sufficient to allow any reasonable possibility of [Lacy] having her own genetic children[.]" Hines and Seago agreed that it was "medically necessary" and in the "best interests" of Lacy's "long-term health" to remove both ovaries by conducting a bilateral salpingo-oophorectomy.[2][3][4]

¶5. A biopsy of Lacy's ovaries conducted shortly after their removal reported that Lacy's ovaries were found not to be cancerous. They tested positive for non-cancerous, serous cystadenofibroma.[5] Hines asserted that he had the report forwarded to a doctor at the Mayo Clinic the same day and that doctor later concurred with the findings. Lacy asserts that even if her ovaries were cancerous, she would have wanted to explore any and all methods to preserve her ability to conceive her own genetic children.

---

[2] Hines and Seago's affidavits stated that they ruled out the possibility of a biopsy to confirm the presence of cancer because they reasoned that a biopsy would not have definitively excluded a diagnosis of cancer and, assuming the ovaries were cancerous, a biopsy could have potentially spread the cancer throughout the pelvis and abdomen.

[3] A bilateral salpingo-oophorectomy is a procedure in which both ovaries are removed.

[4] The justification for the removal of Lacy's ovaries was given in the affidavits of Hines and Seago. Neither Hines's nor Seago's affidavit was submitted as or considered as an expert opinion by the circuit court.

[5] Serous cystadenofibroma is a condition in which a benign tumor appears cancerous.

¶6.     Following the removal of her ovaries, Lacy began hormone replacement therapy (HRT), but was forced to stop treatment due to various blood clots as well as deep vein thrombosis.[6] No longer able to receive HRT, Lacy went into early menopause at approximately thirty years of age. Lacy is unable to conceive her own genetic children.

## PROCEDURAL HISTORY

¶7.     On May 17, 2013, Charles and Lacy filed a pro se complaint against Hines, RM, and Seago in Rankin County Circuit Court asserting that the defendants were negligent in: (1) failing to obtain informed consent to remove Lacy's ovaries; (2) removing Lacy's ovaries; (3) failing to conduct a biopsy of Lacy's ovaries prior to removal; (4) misdiagnosing Lacy's condition; and (5) "other." Hines and RM—later joined by Seago—filed a motion for summary judgment. Charles and Lacy subsequently obtained counsel.

¶8.     On May 22, 2014, the parties entered an agreed order, signed by the circuit court, which stated all outstanding motions "save for the causation part" of the motion for summary judgment would be heard before the court. This included Lacy and Charles's Mississippi Rule of Civil Procedure 56(f) motion, which requested more time to conduct discovery. On October 1, 2014, the circuit court ordered the motion for summary judgment be held in abeyance "except regarding the consent issue." The circuit court also instructed Hines, RM, and Seago "to file either a supplement to the motion [for summary judgment] or a separate

---

[6] Deep vein thrombosis is a condition where a blood clot forms in one or more of the deep veins in the body obstructing the flow of blood through the circulatory system.

4

motion for summary judgment specifically addressing the consent issue[.]"

¶9.     Pursuant to the circuit court's order, Hines and RM—joined by Seago—filed a supplemental motion, addressing the consent issue—including causation. The parties entered an agreed order granting Charles and Lacy an extension of time to respond. Charles and Lacy, "out of an abundance of caution," responded to all arguments raised in the supplemental motion—including causation.

¶10.    On February 6, 2015, the circuit court granted summary judgment in favor of Hines, RM, and Seago. The circuit court noted that its ruling was not based on Charles and Lacy's failure to come forward with expert testimony. Rather, the circuit court based its decision on the fact that the document Lacy signed "specifically included a provision which allowed the doctors to perform any procedure in their judgment necessary that arose during surgery." The circuit court concluded that its judgment on the consent issue was dispositive of all claims raised in Charles and Lacy's complaint. Thus, no other issue was addressed by the circuit court. On February 23, 2015, Charles and Lacy appealed the circuit court's grant of summary judgment to this Court.

**DISCUSSION**

¶11.    The grant of a motion for summary judgment is reviewed de novo. *Karpinsky v. Am. Nat'l Ins.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013). The issue before us is whether Lacy provided appropriate consent for the removal of her ovaries, eliminating her ability to conceive.

I.      **Consent**

¶12. Two different analyses of consent exist: a consent analysis based on assault and battery, and an informed-consent analysis based on medical negligence.

## A.  Battery-Based Consent Analysis

¶13. Mississippi recognizes the requirement that consent be given for medical procedures. As early as 1914, courts have addressed consent based on the law of assault and battery as described by Justice Cardozo in *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (N.Y. 1914) (abrogated on other grounds). As cited in *Fox v. Smith*, 594 So. 2d 596, 604 (Miss. 1992): "Every human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body, and a surgeon who performs an operation without his [or her] patient's consent commits an assault [and battery] for which he [or she] is liable for damages." *Id*. (quoting *Schloendorff* 105 N.E. at 93) (further citation omitted).

## B.  Medical-Negligence-Based Consent Analysis

¶14. Mississippi also recognizes an informed-consent analysis based around a theory of medical negligence, which is analyzed under the critical question of "whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment." *Jamison v. Kilgore*, 903 So. 2d 45, 48-49 (¶10) (Miss. 2005) (quoting *Reikes v. Martin*, 471 So. 2d 385, 392 (Miss. 1985)). "[W]here a plaintiff charges that a doctor performed a procedure without first obtaining informed consent, the plaintiff's first task is to establish what are known risks of the procedure. This requires an expert

6

opinion." *Id*. at 50 (¶17).[7] It is not until after the known risks are enumerated that they can be evaluated as to which are material. *Id*. at (¶16).

### C.     When to Apply Which Analysis

¶15.    Mississippi has not directly addressed when it is appropriate to apply the battery-based analysis or the medical-negligence-based analysis. However, other jurisdictions have. The Rhode Island Superior Court in *Spaight v. Shah-Hosseini*, No. C.A. PC 04-6802 (R.I. Super. Ct. Dec. 30, 2009), addressed the application of these two analyses.

¶16.    In *Spaight*, the patient consented to a laparoscopic pelviscopy[8] to remove a suspected endometriosis,[9] but the procedure instead resulted in the unanticipated removal of her ovary and fallopian tube, as well as other complications. The *Spaight* court noted that a "majority of jurisdictions have characterized a *failure to disclose* material risks and alternatives to treatment as a negligence action, while permitting the application of battery law to remain in the more limited category of cases where the procedure was *unauthorized*." *Id*. (emphasis added). They noted that there are some instances where applying the medical-negligence-

---

[7] "Such expert testimony may be developed from expert witnesses, admissions by the defendant, or other authoritative sources as allowed by the Mississippi Rules of Evidence." *Jamison*, 903 So. 2d at 50 n.2.

[8] A laparoscopic pelviscopy is a procedure where carbon dioxide is blown into the body cavity to allow for direct visualization of the ovaries, fallopian tubes, and uterus. It is typically done to diagnose and treat pelvic organ disorders, as well as to perform surgical procedures on the same organs.

[9] Endometriosis is a disorder in which tissue that normally lines the inside of the uterus grows on the outside of the uterus.

7

based analysis as opposed to battery-based analysis would be "illogical." *Id*. One such instance is when a procedure is performed that was not considered beforehand, as it would make no logical sense to require the plaintiff to prove the doctor had a duty to disclose a material or known risk of an uncontemplated procedure. *Id*.

¶17.   The Louisiana Supreme Court has also found the application of the battery-based analysis to be appropriate when a procedure completely lacked consent. *Pizzalotto v. Wilson*, 437 So. 2d 859, 862-64 (La. 1983).[10] In *Pizzalotto*, the patient consented to a laparoscopy.[11] *Id* at 862. Upon observing the patient's reproductive organs, the doctor believed they were too damaged and performed a hysterectomy,[12] claiming "failure to remove the reproductive organs would result in pain and infection." *Id*. The court applied the battery-based analysis because the removal of the patient's ovary and other reproductive organs could not logically be considered a "risk" of the laparoscopic procedure that was disclosed. *Id* at 863.

## II.    Lack of Expert Testimony

¶18.   As stated above, a medical-negligence-based complaint requires expert testimony to establish the known or material risks associated with a procedure. *Jamison*, 903 So. 2d at 49 (¶¶15-17). Here, no expert testimony was submitted. Hines's and Seago's affidavits were

---

[10] Louisiana later abrogated this decision by statute as noted in *Thibodeaux v. Jurgelsky*, 898 So. 2d 299, 303-04 (La. 2005).

[11] A laparoscopy is a procedure where a fiber-optic instrument is inserted through the abdominal wall to view organs or to allow for a surgical procedure.

[12] Removal of all or part of the uterus.

taken by the court only as lay descriptions of what happened, not expert testimony. Even if their affidavits were taken as expert testimony, they do not state whether removal of Lacy's ovaries was a known or material risk of the procedure. Further, there is no indication from the record that Lacy was told that loss of her ovaries was a risk of the procedure, nor do the parties dispute that she was not told that loss of her ovaries was a risk. Thus, without expert testimony, the battery-based analysis is the only analysis under which this complaint could have been examined, unless the written authorization signed by Lacy would control.

¶19.    Judge Carlton's dissent highlights the status of the law using what we describe as the medical-negligence-based analysis of consent.[13] Our opinion does not arrive at the application of that analysis. Judge Carlton's position that the trial court should be affirmed due to the lack of expert testimony is not properly before the Court. The circuit court explicitly stated in its order granting summary judgment that its decision was not based on the absence of expert affidavits from Lacy, nor did it consider the affidavits of Hines or Seago as expert testimony. By its October 1, 2014 order, the circuit court narrowed the issue for its consideration, which is before us, to consent. It held in abeyance all issues raised in Hines's, RM's, and Seago's motion for summary judgment, Lacy's motion to file an amended answer, and Lacy's motion for additional time to respond under Rule 56(f), which

---

[13] The cases cited by Judge Carlton rely on the medical-negligence-based analysis of consent, not the battery-based analysis. *See McMichael v. Howell*, 919 So. 2d 18 (Miss. 2005); *Jamison v. Kilgore*, 903 So. 2d 45 (Miss. 2005); *Whittington v. Mason*, 905 So. 2d 1261 (Miss. 2005); *Reikes v. Martin*, 471 So. 2d 385 (Miss. 1985).

9

included Lacy's request for more time to conduct discovery. The circuit court's instructions and ruling were based solely on the consent form signed by Lacy provided by Hines and RM.

¶20.    The circuit court was appropriate in so limiting its review, as discovery had not yet even begun. Lacy had not been able, through discovery, to ascertain if Hines, RM, or Seago considered removal of Lacy's ovary(ies) a known or material risk of the procedure.[14] If they did, there is no indication in the record before the Court that Lacy was advised of such. It is not controverted that Lacy did not give express consent or give permission for her ovaries to be removed. The analysis based on her lack of consent under the longstanding battery theory of consent controls at this early stage of the proceeding below where no expert testimony was going to be and none was considered by the circuit judge. Judge Carlton's use of the medical-negligence consent analysis is premature given the early stage of the litigation at which the trial court made the decision before us.

¶21.    Judge Wilson's dissent relies on the doctors' affidavit statements to determine that the signed consent form was sufficient. The form limits consent to medical procedures that would be necessary or emergent. Determination of whether the procedure would be necessary or emergent should require expert testimony. As the circuit court considered nothing before

---

[14] Judge Carlton's dissent relies on cases in which discovery had proceeded or the case had gone to trial. In *McMichael*, the plaintiff provided answers to interrogatories and the circuit court allowed the plaintiff additional time to depose the defendant and provide expert-witness disclosures. *McMichael*, 919 So. 2d at 20 (¶3). In *Whittington*, a trial had been conducted. *Whittington*, 905 So. 2d at 1263 (¶12). In *Reikes*, a trial had also been conducted. *Reikes*, 471 So. 2d at 385.

10

it as expert testimony, on appeal Judge Wilson's analysis is premature.

### III.    Waiver Form

¶22.    Though waivers executed by a patient "can be helpful," they are not necessarily dispositive of a patient's consent. *Barner v. Gorman*, 605 So. 2d 805, 808 (Miss. 1992).[15] "A simple waiver form with boilerplate language applicable to any surgical procedure may not be adequate." *Id*. "[D]isclosure to a patient should be specific to that patient's treatment." *Id*. *Barner* is factually instructive as well on the case before us. In *Barner*, the doctor suggested that consent to the procedure involved in that case was evidenced by a consent form signed by the patient authorizing "other medical services." The *Barner* court did agree that the form was evidence of the patient's consent, but noted that it was not *conclusive* evidence of the patient's consent. Similar language was at issue in *Spaight* and *Pizzalotto*. In those cases, as in *Barner*, the language was rejected as not indicative of consent for the procedure at issue before the respective courts.

¶23.    Here, the section of the form at issue authorized "necessary or emergent" medical procedures. Though this does go toward evidence of Lacy's consent to the procedures done, we cannot say that it is conclusive of consent to the removal of her ovaries or to what the known or material risks were of her surgery. Nowhere in the record is there any indication that Lacy was told that the removal of her ovaries was a risk. Neither Lacy nor the defendants

---

[15] Judge Wilson's dissent criticizes our use of *Barner*, a case dealing with informed consent. However, *Barner*'s logic concerning written waivers would apply to both battery-based consent analyses and informed-consent analyses.

assert that she was informed that removal of her ovaries was a possible risk of the procedure. Thus, we find that the document signed by Lacy is not presently dispositive of whether or not she gave consent to the removal of her ovaries. We do not decide whether the document should be construed against the writer based on its alleged imperfection or whether Lacy could have been deemed to have made an informed decision under the medical-negligence-based analysis after expert testimony and other evidence.

## IV. Application of Law

¶24.    In the case at hand, Lacy sought Hines's services for the purpose of increasing her ability to bear her own children, and agreed to the removal of ovarian cysts and one fallopian tube in pursuit of that goal. Instead of removing any cysts or the fallopian tube, Hines removed both ovaries, which was a "substantially different" procedure than that to which she consented. *See Samoilov v. Raz*, 536 A.2d 275, 280-81 (N.J. Super. Ct. App. Div. 1987) (The battery analysis is appropriate when the performed procedure was "substantially different" from that to which consent was given.). The removal of her ovaries was a procedure that *foreclosed* her ability to produce her own eggs for conception, whereas the procedures anticipated and authorized were authorized in order to *increase* her ability to bear her own children. Without question, the procedure performed was "substantially different" than that authorized. Further, and similar to the situation in *Pizzalotto*, the destroying of Lacy's ability to naturally conceive by the removal of her ovaries was not logically a perceived risk of the procedure meant to increase her fertility, as it was antithetical to the purpose of the surgery.

12

Clearly, Lacy did not expressly authorize the removal of her ovaries.

¶25. In dissent, Judge Wilson characterizes our opinion as a declaration of public policy. However, our decision is merely based upon application of Mississippi law in existence. *Marchbanks v. Borum*, 806 So. 2d 278, 288 (¶28) (Miss. Ct. App. 2001) (reaffirming that a medical procedure involving a touching requires consent as stated in *Fox*, 594 So. 2d at 604, and established in *Phillips ex rel. Phillips v. Hull*, 516 So. 2d 488 (Miss. 1987) (overruled on other grounds)).

¶26. The case before the Court is a review of the summary judgment granted below under Mississippi Rule Civil Procedure 56(c). We are not reviewing or making a declaratory judgment. M.R.C.P. 57. Based upon the limited scope of the judgment and limited facts before us, we find that there are genuine issues as to material facts and that the moving parties are not entitled to a judgment as a matter of law.

¶27. Thus, we find that, under the battery-based analysis of consent, Lacy did not give express consent for the removal of her ovaries and that the consent form signed by Lacy did not summarily provide consent to remove her ovaries. As the circuit court's decision did not reach whether or not the removal of her ovaries became necessary or emergent during the medical procedure that was consented to by Lacy, nor did the judgment address any other analysis of consent pertinent to theories of medical liability, we reverse and remand.

## CONCLUSION

¶28. We reverse and remand the Rankin County Circuit Court's grant of summary

13

judgment for further proceedings consistent with this opinion.

¶29.   **THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.**

**IRVING, P.J., BARNES, ISHEE AND JAMES, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. WILSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J., AND CARLTON, J. LEE, C.J., AND FAIR, J., NOT PARTICIPATING.**

**CARLTON, J., DISSENTING:**

¶30.   I respectfully dissent. I would affirm the circuit court's grant of summary judgment to Hines, RM, and Seago because Lacy failed to raise a genuine issue of disputed material fact as required to survive summary judgment. The record reflects that Lacy signed a consent document agreeing that Hines, as well as other physicians he might consult with, could perform a laparoscopic ovarian cystectomy to remove cysts on her ovaries and to possibly remove a fallopian tube. Lacy also consented to such additional surgeries and procedures (whether or not arising from presently unforeseen conditions) that the medical staff considered necessary or emergent.

¶31.   Lacy presented no expert testimony to dispute the summary-judgment evidence submitted by Hines, RM, and Seago that Hines and Seago consulted during Lacy's surgery and determined, in their opinion, that removal of Lacy's ovaries was necessary and/or emergent. The undisputed facts show that, once the laparoscopy began, Hines discovered Lacy's right ovary was enlarged and covered in cysts and that no normal ovary tissue was

14

present. The left ovary was also enlarged, surrounded by similar abnormal tissue, and completely lacking normal tissue. Concerned that both ovaries were cancerous, Hines consulted intraoperatively with Seago, an obstetrician/gynecologist specializing in gynecological cancers. Seago confirmed Hines's findings that both ovaries were enlarged, diseased, and lacking any normal tissue. The undisputed facts also show that Seago concurred with Hines's opinion that both ovaries were highly suspicious for cancer.

¶32. In light of Lacy's medical history of severe pelvic pain and recurrent ovarian cysts; her family history of ovarian, uterine, cervical, and breast cancer; and the absence of any normal ovarian tissue to allow her to bear a child from her own eggs, Hines and Seago consulted and agreed during surgery that it was medically necessary for Lacy's health for her ovaries to be removed. The record reflects that a biopsy was contraindicated for fear of spreading cancer elsewhere in her pelvis and abdomen and that even a negative biopsy would not have ruled out cancer since benign lesions can develop into cancer.

¶33. In response to the summary-judgment motion, Lacy presented no evidence or expert testimony. In failing to present expert testimony to rebut the summary-judgment evidence submitted by Hines, RM, and Seago, Lacy failed to rebut their evidence and arguments that no dispute of material fact existed as to their medical opinion that the removal of Lacy's ovaries was a necessary and emergent procedure and that Lacy's consent to such procedures applied to the removal of her ovaries. As our caselaw establishes, a party opposing summary judgment must be diligent and may not rest on mere allegations or denials in the pleadings.

*McMichael v. Howell*, 919 So. 2d 18, 21 (¶5) (Miss. 2005). The Mississippi Supreme Court explained in *McMichael* that, where a plaintiff claims a physician has breached the duty to obtain the patient's informed consent, the familiar elements of duty, breach, causation, and damage apply. *Id.* at 22 (¶8). The supreme court stated that the individual claiming a breach of the duty to inform and procure patient consent must make more than mere allegations to show that a breach has occurred. *Id.* The *McMichael* court further stated that, "where a plaintiff charges that a doctor performed a procedure without first obtaining informed consent, the plaintiff's first task is to establish what are known risks of the procedure, and this requires an expert opinion." *Id.* at (¶9) (citing *Jamison v. Kilgore*, 903 So. 2d 45, 50 (¶17) (Miss. 2005)).

¶34. The record here reflects that the circuit court held all matters in abeyance except for the consent issue on summary judgment. The circuit court did not relieve Lacy of her burden to rebut or to respond to the summary-judgment issue of informed consent. However, the only evidence that Lacy submitted to counter the evidence submitted by Hines, RM, and Seago was her own affidavit. The circuit court properly held that Lacy's response was insufficient to support her claim that a genuine issue of disputed material fact existed.

¶35. As the record reflects, Lacy presented no expert testimony by physicians in the relevant field of medicine as to what additional surgeries or procedures were necessary or urgent due to the condition of her ovaries and relative to the laparoscopic ovarian cystectomy to remove the cysts on her ovaries and to possibly remove a fallopian tube. *See Whittington*

16

*v. Mason*, 905 So. 2d 1261, 1266 (¶25) (Miss. 2005) ("[E]xpert testimony is required to assist the finder of fact in determining whether a particular risk is material, requiring disclosure to the patient prior to a medical procedure[.]"). Lacy also provided no expert testimony as to what risks were material or required disclosure to her as a patient prior to this medical procedure. She failed to present expert testimony to support her claim of a lack of informed consent, and she failed to raise a dispute of material fact to support her claims. *See id.* at (¶21) (recognizing that an objective standard applies to determine what information a physician must disclose).[16]

¶36.　Based on the foregoing, I would affirm the circuit court's grant of summary judgment to Hines, Seago, and RM. I therefore dissent from the majority's opinion.

**WILSON, J., DISSENTING:**

¶37.　Under Mississippi law, a patient may assert two types of "consent" claims against a physician. First, "a surgeon who performs an operation without his patient's consent commits an assault [and battery] for which he is liable for damages." *Fox v. Smith*, 594 So. 2d 596, 604 (Miss. 1992). Second, even if the physician obtains the patient's consent in fact, the physician may still be liable if that consent was not "informed." *Jamison v. Kilgore*, 903

---

[16] *See Reikes v. Martin*, 471 So. 2d 385, 392-93 (Miss. 1985) (holding that, in a medical-malpractice action based on the doctrine of informed consent, an objective standard applies, and the question is whether a reasonably prudent patient, fully advised of material known risks, would have consented to the suggested treatment). *See also Latham v. Hayes*, 495 So. 2d 453, 458 (Miss. 1986) (applying the objective standard from *Reikes* to informed consent and acknowledging that the plaintiff bears the burden of proof to establish the professional standards of the medical profession for informed consent to the particular risk).

So. 2d 45, 49-50 (¶15) (Miss. 2005). For consent to be informed, the patient must be advised of the material and "known *risks of the procedure*." *Id.* at 50 (¶17) (emphasis added).

¶38. The Dodds' claim is a no-consent claim, not an informed-consent claim. Logically, it cannot be an informed-consent claim because the injury about which they complain—the removal of Lacy's ovaries—was not a *risk of the procedures* to which she admits she consented. The removal of her ovaries was not an "undesirable symptom or condition" caused by the procedures to which she consented, *id.*, nor was it a response to complications of those procedures. It was a *different procedure* (a bilateral salpingo-oophorectomy) that Dr. Hines deemed necessary and performed once he found that Lacy's ovaries appeared to be cancerous. The only issue in this case is whether Lacy consented to that procedure in fact.

¶39. Whether Lacy gave consent turns on whether the procedure was covered by the following provision of the consent agreement that she signed:

> I further consent and authorize the performance of such additional surgeries and procedures (whether or not arising from presently unforseen conditions) considered necessary or emergent in the judgment of my doctor or those of the hospital's medical staff who serve me.

¶40. The undisputed material facts establish that Lacy's bilateral salpingo-oophorectomy was covered by her consent. Dr. Dodd was treating Lacy for infertility, a history of ovarian cysts, and pelvic pain. After other treatments were unsuccessful, Lacy consented to a laparoscopy with an ovarian cystectomy and a possible salpingectomy (removal of a fallopian tube). In the course her surgery, Dr. Hines found that both of Lacy's ovaries had an "extremely abnormal appearance" and "appeared to be cancerous." Dr. Hines knew that

18

Lacy "had a family history of ovarian cancer, which is a disease with a high mortality rate." Dr. Hines therefore asked for an intraoperative consult with Dr. Seago, a gynecologic oncologist. Dr. Seago examined Lacy and concurred that both ovaries appeared cancerous. Dr. Seago and Dr. Hines agreed that "removal of the ovaries was necessary for [Lacy's] long-term health" and "in [her] best interest." The tumors that they observed had "taken over both ovaries to such an extent that normal ovarian tissue was essentially unrecognizable." For this reason, they concluded that "the likelihood that [Lacy] would ever have a child from one of her own eggs was practically nonexistent."[17] Therefore, based on his professional judgment as a gynecologic oncologist, Dr. Seago recommended the removal of Lacy's ovaries. And, exercising his professional judgment, Dr. Hines concurred and performed the procedure.

¶41. Although Lacy now maintains that her doctors could have taken a biopsy and awaited the results rather than removing her ovaries, neither doctor considered that to be appropriate medical care under the circumstances. Both explained that they believed that a biopsy would have risked spreading the cancer that they believed existed and reduced Lacy's chances of survival. Furthermore, a biopsy could not have ruled out cancer definitively, and in the doctors' judgment, even non-cancerous lesions such as those covering Lacy's ovaries would have been a continuing health risk because they "can degenerate into cancer if not removed." Thus, a biopsy would have been contrary to Dr. Hines's and Dr. Seago's medical judgment.

¶42. Based on these undisputed facts, there is no question that Dr. Hines performed a

---

[17] Lacy subsequently carried and gave birth to two children from donor eggs.

procedure that he and Dr. Seago "considered necessary . . . in [their] judgment." There is no evidence or suggestion that their stated reasons for performing the procedure were pretextual and that they actually removed Lacy's ovaries for some other reason. Nor is there any basis for speculating that a doctor whose practice is dedicated to treating infertility would undertake such a procedure against his own best judgment. The majority asserts that the "[d]etermination of whether the procedure would be necessary or emergent should require expert testimony," and the majority apparently believes that it was the doctors' burden to come forward with such testimony. *Ante* at (¶21). But this simply rewrites the actual terms of Lacy's consent. Lacy expressly consented to "such additional procedures . . . *considered necessary . . . in the judgment of [Dr. Hines] or [Dr. Seago]*" (emphasis added). The affidavits of Dr. Hines and Dr. Seago establish that they considered the procedure necessary in their medical judgment. They do not need an expert to testify about what they considered necessary *in their own judgment*. Therefore, based on the terms of the consent agreement that Lacy signed, there is no genuine issue of material fact as to whether she consented to the procedure. She did, and the defendants are entitled to judgment as a matter of law.

¶43.    Rather than simply applying the terms of Lacy's consent agreement to the undisputed facts, the majority cites *Barner v. Gorman*, 605 So. 2d 805, 808 (Miss. 1992), for the proposition that a consent form is only evidence of a patient's consent and is not conclusive. However, *Barner* was an informed-consent case, and the Court held only that the form's general statement that the risks of a procedure had been explained to the patient was not

20

conclusive given the patient's testimony that a specific risk was never explained. *See id.* at 806-08. The Court did not hold that the form was anything less than conclusive as to whether the patient had consented *in fact*—only that it was not dispositive as to whether her consent was informed. As discussed above, this case involves a no-consent claim, not an informed-consent claim, so *Barner* is inapposite. Lacy's signed consent demonstrates that she consented in fact to additional procedures deemed necessary in her doctor's medical judgment, and the circuit court properly granted summary judgment.

¶44. By refusing to enforce Lacy's consent agreement, the majority effectively holds that such an agreement—i.e., one in which a patient gives preoperative consent to additional procedures deemed necessary in his or her doctor's judgment—is void as against public policy. This becomes clear when the majority declares that Lacy's consent was ineffective because Dr. Hines performed a procedure that, in the majority's estimation, was "substantially different" than the procedures originally contemplated. *Ante* at (¶24) (quoting *Samoilov v. Raz*, 536 A.2d 275, 280-81 (N.J. Super. Ct. App. Div. 1987)). The New Jersey case from which the majority borrows this standard articulated a common law rule of construction—a default rule—that when a "patient consented to the performance of one kind of operation," her consent will be understood, "in the absence of proof to the contrary," to extend to such other procedures as her physician, "in the exercise of . . . sound professional judgment, determines are reasonably necessary to treat [her] condition." *Samoilov*, 536 A.2d at 280-81. Apparently, the majority has transformed this default rule of New Jersey common

21

law into a mandatory limitation on every medical consent form signed in the State of Mississippi. In effect, the majority declares that any consent that is not so limited is void as against public policy.

¶45. The actual terms of Lacy's consent contain no such limitation. Lacy authorized her doctor to perform such additional procedures as he concluded, in the course of surgery, were necessary in his medical judgment—not just procedures deemed "substantially" similar in hindsight by lawyers. The procedure at issue was covered by Lacy's consent, as Dr. Hines not only relied on his own judgment but also took the added precaution of an intraoperative consult with a subject matter expert. Clearly, the majority disapproves of the breadth of Lacy's preoperative consent, but that is not a basis for invalidating it. *See Estate of Reaves v. Owen*, 744 So. 2d 799, 802 (¶9) (Miss. Ct. App. 1999) ("The function of the courts is to enforce contracts rather than enable parties to escape their obligation upon the pretext of public policy." (quoting *Smith v. Simon*, 224 So. 2d 565, 566 (Miss. 1969))). Whether a patient should be able to grant such consent to his or her physician prior to an operation is an issue on which reasonable minds may differ. But in the absence of a clear public policy prohibiting such an agreement, we should enforce the consent to surgery, which Lacy signed voluntarily, according to its terms. *See Barbour v. State ex rel. Hood*, 974 So. 2d 232, 244 n.19 (Miss. 2008) ("Our constitutional duty . . . is to apply the law, and leave matters of public policy to the other branches.").

¶46. In addition to my basic disagreement with the majority's view of this case, I fear that

22

the majority opinion leaves the status of the Dodds' claim unclear. At one point, the majority seems to conclude that the Dodds' claim is a no-consent claim because it would be "illogical" to treat it as an informed-consent claim (*see ante* at (¶¶15-17)), which is my own conclusion. Yet in the next sections, the majority seems to imply that the Dodds may pursue an informed-consent claim on remand if they obtain expert testimony to support it. *See ante* at (¶¶18-20, 23). A clear holding on this issue is necessary to guide the circuit court and the parties on remand. In addition, the majority seems to indicate at one point that Lacy's consent is "evidence of [her] consent to the procedures done," just not "*conclusive* evidence." *Ante* at (¶22). This suggests that whether Lacy consented to the procedure remains a genuine issue of fact to be litigated on remand. Yet in the next section, the majority states that "*[c]learly*, Lacy did *not* expressly authorize the removal of her ovaries." *Ante* at (¶24) (emphasis added). This implies that the majority has concluded that *Lacy* is entitled to judgment as a matter of law on her no-consent (i.e., battery) claim. The Court's holding on this issue should also be clarified for the circuit court and the parties.

¶47. For the foregoing reasons, I would affirm the circuit court's order granting summary judgment in favor of all defendants. Accordingly, I respectfully dissent.[18]

**GRIFFIS, P.J., AND CARLTON, J., JOIN THIS OPINION.**

---

[18] I agree with parts of Judge Carlton's dissent; however, like the circuit court, I would not rely on the Dodds' lack of expert testimony as a basis for granting summary judgment. While issues of causation or lack of expert testimony may eventually prove dispositive on remand, I cannot help but conclude that the circuit court's orders in this case were intended to—or at least were reasonably interpreted to—hold those issues in abeyance.